**LANE ENTERPRISES, INC.**

v.

**L.B. FOSTER COMPANY, Appellant.**

**L.B. FOSTER COMPANY, Appellant,**

v.

**LANE ENTERPRISES, INC.**

Superior Court of Pennsylvania.

Argued June 10, 1997.

Filed Aug. 7, 1997.

Reargument Denied Oct. 16, 1997.

2. 1 Pa.C.S. § 1901 et seq.

David L. Voltz, Pittsburgh, for appellant.

John B. Consevage, Harrisburg, for appellee.

Before CIRILLO, President Judge Emeritus, and JOHNSON and FORD ELLIOTT, JJ.

CIRILLO, President Judge Emeritus.

L.B. Foster Company (Foster) appeals from the order entered in the Court of Common Pleas of Bedford County.[1] We reverse.

This appeal arises out of litigation concerning an agreement between Foster, a manufacturer of steel bridge components and Lane Enterprises, Inc. (Lane), a company specializing in the coating of steel materials. In the spring of 1992, Foster agreed to sell Hammond Construction, Inc. (Hammond) various bridge components for use in the construction of a bridge in Summit County, Ohio. This agreement (the Hammond Agreement) specified that Foster was to supply the bridge components in two separate stages. The Hammond Agreement also stated that the bridge components were to be coated in accordance with the Ohio Department of Transportation (ODOT) specifica-

---

1. Although the Superior Court Prothonotary has listed the present appeal at two separate docket numbers, in actuality, only one party is appealing one order.

tions.[2] Because Foster was not equipped to coat the bridge components that it manufactured, it sought an outside contractor, Lane, to perform the coating process. On September 23, 1992, Foster and Lane orally agreed that Lane would clean and coat the bridge components. The agreement was confirmed by Foster's purchase order which specified that all cleaning and coating performed by Lane was to be in compliance with ODOT standard specifications for construction and materials and that Lane was not to ship any coated components without prior approval from an ODOT inspector (The Lane Agreement). In addition, reflecting Foster's delivery obligations pursuant to the Hammond Agreement, the Lane Agreement provided that Lane clean and coat the bridge components in two separate stages, the first stage to be delivered in October of 1992 (Stage I) and the second stage in June of 1993 (Stage II). Pursuant to the Lane Agreement, Foster shipped Stage I of the uncoated bridge components to Lane's facility in Carlisle, Pennsylvania for processing. Lane then commenced the cleaning and coating process for the Stage I components. During cleaning, however, some steel residue (shot) as well as other surface contaminants remained on the steel and became trapped under the coating.[3] ODOT Inspectors visited Lane and examined the coated components. Although the ODOT inspectors were not fully satisfied with the amount of contamination trapped under the epoxy coating, they permitted shipment pending removal and re-application of the coating.

On January 5, 1993, Lane's quality assurance manager, Gary Hinkelman, wrote a letter to Foster detailing the problems that Lane faced while coating the Stage I components. Hinkelman explained Lane's inability to remove all of the contaminants and inquired as to whether Foster desired Lane to coat the Stage II components or retain Midwest Coating to complete Stage II. On January 27, 1993, a meeting was held at the bridge construction site. ODOT engineer David Nist conducted an inspection of the delivered stage I components. Nist performed a contamination test by chipping a piece of the epoxy coating which revealed backside contamination. Additionally, Nist's inspection revealed that the epoxy coating on the trimbars, components attached to the sides of the bridge floor, was readily removable. Nist then informed Lane that the coating procedure did not adhere to the Steel Structure Painting Council's surface preparation standard ten (SSPC SP–10) which was required for ODOT's approval. Nist, therefore, rejected the coated components.

A second on-site meeting was convened on February 5, 1993 to discuss how to rectify the situation. Representatives from Lane, Foster, and Hammond were all present. Lane representatives noted that pursuant to SSPC SP–10, ten to twenty percent backside contamination of an epoxy chip was acceptable. Via tele-conference, ODOT vehemently disagreed, stressing that SSPC SP–10 allowed zero percent backside contamination. Lane representatives then informed those present that if SSPC SP–10 required zero percent contamination, Lane would be unable to meet those requirements.

On February 8, 1993, ODOT sent a letter to Hammond formally rejecting the Stage I coated bridge components in their present condition. ODOT proposed, however, that if the unacceptable portions of the components underwent certain field repairs, ODOT would accept the components. Foster sent a letter to Lane advising that Foster would withhold payment until corrections were made. At this time, Foster still owed Lane $18,018.06 for Stage I. Lane agreed to assume the cost of the field repairs, which would be deducted from the $18,018.06 still owed to Lane. Hammond then subcontracted with Thomarios Painting to complete the field repairs at a cost of $10,935.84. After the repairs were completed, Lane requested the amount still owing on Stage I, $7,082.22.

ODOT eventually permitted Hammond to proceed with erection of the bridge, thus, presumably approving the repaired bridge

---

2. Coating the metallic bridge components is necessary to prevent corrosion.

3. Impurities trapped between the epoxy coating and the steel surface in construction parlance is called "backside contamination."

components.[4] On June 15, 1993, Foster sent Lane a letter inquiring as to whether Lane intended to perform Stage II of the Lane Agreement. The letter also stated that outstanding monies due Lane for Stage I, $7,082.22, would not be released until Lane gave assurances concerning its commitment to Stage II of the Lane Agreement. Lane responded that it would not discuss Stage II until Foster remitted the monies owed under Stage I. Foster sent a second letter on July 2, 1993, repeating its request for assurance of performance by Lane. Lane again responded that it would not proceed in any way until Foster satisfied the full payment for Stage I of the Lane Agreement. On August 17, 1993, Foster, faced with the prospect of delay damages under the Hammond Agreement, hired Encor Coating Incorporated (Encor) to complete Stage II at a cost of $99,329.15, $42,055.00 more than it would have paid Lane to complete Stage II under the agreement.

Foster then initiated suit against Lane by filing a writ of summons in Bedford County. Lane also initiated suit, filing a complaint in Cumberland County. The cases were subsequently consolidated in Bedford County and a bench trial ensued. The trial court found in favor of Lane on its counterclaim in the amount of $7,082.22. This appeal followed. Foster presents the following issues for our consideration:

1. Whether the principles of section 2–609 of the Uniform Commercial Code apply to this case?

2. Whether a party has the right to request adequate assurances that a contract will be performed when the obligor 1) presents in writing a statement that the obligor is only capable of producing defective work and that the obligee might look to obligor's [sic] competitor for completion of the work; 2) makes statements that the contract cannot be specifications imposed by the purchaser; and 3) when the work done by the obligor is rejected in total by the purchased at the job site?

3. Whether a party's good faith withholding of a small percentage of the overall contract price constitutes such a material breach as to excuse the other party from performing its contractual obligations?

 As an initial matter, we must discern whether the present appeal is properly before this court. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302. Our courts have consistently interpreted this rule to require litigants to both raise and preserve issues in the lower court to prevent waiver. *See Yudacufski v. Department of Transportation,* 499 Pa. 605, 454 A.2d 923 (1982); *Randt v. Abex Corp.,* 448 Pa.Super. 224, 671 A.2d 228 (1996). In civil non-jury trials, litigants desiring to avoid waiver of issues on appeal generally must first file post-trial motions in the trial court. Pa. R.C.P. 227.1(b)(2) ("Grounds not specified [in post-trial motions] are deemed waived ... "). *See Fernandes v. Warminster Mun. Auth.,* 296 Pa.Super. 523, 442 A.2d 1174 (1982). The purpose of the waiver rule is to promote judicial economy by providing the trial court with an opportunity to review and reconsider its earlier rulings and correct its own error. *Soderberg v. Weisel,* 455 Pa.Super. 158, 687 A.2d 839 (1997). Our supreme court, in the seminal case of *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 257, 322 A.2d 114, 116 (1974), explains how a failure to preserve issues could drain judicial resources:

> The diligent and prepared trial lawyer—and his client—are penalized when an entire case is retried because an appellate court reverses on the basis of an error opposing counsel failed to call to the trial court's attention.

> \* \* \* \*

> This opportunity to correct alleged errors at trial advances the orderly and efficient use of our judicial resources.

*Id.* Under certain limited circumstances, however, such as where trial courts sitting without a jury enter orders which appear to be final, failure to file post-trial motions will

---

4. ODOT did not provide written approval of the bridge components, nonetheless, ODOT permit-ted Hammond to commence construction.

not result in waiver of the issues on appeal. *See Donegal Mut. Ins. Co. v. State Farm,* 377 Pa.Super. 171, 546 A.2d 1212 (1988). *See also Storti v. Minn. Mut. Life Ins. Co.,* 331 Pa.Super. 26, 28, 479 A.2d 1061, 1062 (1984) ("Where an order [does not] contain a suggestion that exceptions must be filed in order to preserve a right of appeal, the failure to file exceptions will be excused.").

In the present case, upon completion of hearing testimony, the trial court directed the parties to file "post-trial memoranda" regarding the legal issues contested at trial. Both parties filed lengthy briefs. Instead of issuing findings of fact and conclusions of law, however, the trial court issued an opinion disposing of issues raised by Foster and finding in favor of Lane. Upon receipt of the opinion, Foster, assuming that the trial court opinion was a final order, filed a praecipe to enter judgment and a notice of appeal. After reviewing the record, it is clear that Foster has technically not complied with Rule 227.1, since no post-trial motions were filed. Pa. R.C.P. 227.1. It appears, however, that the trial court led both parties to believe that its order was final, since the court filed an opinion addressing issues which had been submitted to it, albeit prior to issuing a verdict.[5] *See Donegal, supra.* In addition, presently hearing this appeal does not conflict with the principal purpose of the waiver doctrine, i.e. to promote judicial economy, because Foster is contesting on appeal the identical issues that the trial court addressed in its opinion. To quash this appeal would result in a blind application of the waiver doctrine. Accordingly, we do not find that Foster has waived appellate review. The trial court's opinion is a *de facto* final order. *Donegal, supra.*

Having found that we possess jurisdiction to hear the present appeal, we note our standard of review. The role of an appellate court in reviewing the trial court's final judgment is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law; findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. *Murray v. McCann,* 442 Pa.Super. 30, 658 A.2d 404 (1995); *Stahli v. Wittman,* 412 Pa.Super. 281, 603 A.2d 583 (1992); *Reuter v. Citizens & Northern Bank,* 410 Pa.Super. 199, 599 A.2d 673 (1991); *Porter v. Kalas,* 409 Pa.Super. 159, 597 A.2d 709 (1991). When this court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected. *Short v. Metropolitan Life Ins. Co.,* 339 Pa.Super. 124, 488 A.2d 341 (1985).

The trial court found that Foster's failure to remit the final $7,082.22 on Stage I to Lane amounted to a breach of the Lane Agreement, thereby permitting Lane to suspend performance under the Lane Agreement. The trial court reasoned, therefore, that because Lane was legally entitled to suspend performance, Lane was not liable for any damages Foster incurred as a result of said suspension. Additionally, the trial court found that Lane was entitled to the $7,082.22 due and owing under the Lane Agreement.

Foster vehemently disagrees with the trial court's findings and conclusions. Foster argues that the withholding of Lane's $7,082.22 was not a material breach under established Pennsylvania contract law and thus Lane was not entitled to suspend its performance under the Lane Agreement. Additionally, Foster contends that it had the right to request adequate assurances of performance due to Lane's January 5, 1993 letter to Foster and that Lane's failure to provide such assurance amounted to a repudiation of the Lane Agreement. Foster concludes, therefore, that it is entitled to the amount over and above the full price of the Lane Agreement that it had to pay another contractor to coat the Stage II components less the $7,082.22 owed to Lane prior to Lane's breach.

---

**5.** Although not dispositive, further indication that the parties believed that the order was final can be deduced from appellee's failure to file a separate motion to quash or raise the issue in its appellate brief.

Our initial inquiry must be whether the trial court erred in finding that Foster's withholding of $7,082.22 under the Lane Agreement constituted a material breach of that agreement.[6] If the trial court did not err in so finding, then our inquiry ends because a material breach entitles the non-breaching party to suspend performance under the contract.

"When performance of a duty under a contract is due, any nonperformance is a breach." Restatement (Second) of Contracts § 235(2) (1981). *See Barnes v. McKellar*, 434 Pa.Super. 597, 644 A.2d 770 (1994); *Camenisch v. Allen*, 158 Pa.Super. 174, 44 A.2d 309 (1945). If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract. *Oak Ridge Const. Co. v. Tolley*, 351 Pa.Super. 32, 504 A.2d 1343 (1985). If, however, the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective. *Cimina v. Bronich*, 517 Pa. 378, 537 A.2d 1355 (1988); *Borough of Greentree to Use of Castelli Const. Co. v. Tortorete*, 205 Pa.Super. 532, 211 A.2d 76 (1965); *Schlein v. Gross*, 186 Pa.Super. 618, 142 A.2d 329 (1958). *Accord* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 11–22 (2d ed. 1977). In other words, the non-breaching party does not have a right to suspend performance.

Because Foster was in breach when it refused to remit the $7,082.22 still owing under Stage I of the Lane Agreement, it is necessary it ascertain whether such breach was material. *Id.* "Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end 'is a question of degree; and it must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'" *Gray v. Gray*, 448 Pa.Super. 456, 468, 671 A.2d 1166, 1172 (1996) (*citing 2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies*, 319 Pa.Super. 228, 242–43, 466 A.2d 132, 139 (1983) (citations omitted)). In determining materiality for purposes of breaching a contract, we consider the following factors:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981). *Accord Jennings v. League of Civic Organizations of Erie County*, 180 Pa.Super. 398, 119 A.2d 608 (1956).

In the present case, the trial court ruled that Foster's actions constituted a breach of its agreement with Lane. The trial court explained that because Foster gave Lane the opportunity to cure defects present in the coating and because Lane did in fact cure the defects, as evidenced by ODOT's permission to Hammond to commence construction with the coated components, Foster had no right to retain the $7,082.22 that it owed Lane for

---

**6.** We need not explicitly determine whether Section II of the Uniform Commercial Code (UCC) applies to the present case, because the principles contained in the provisions applicable to the present case are almost identical to the applicable Restatement principles. We do note, however, that the prerequisite to the UCC's application is that there must be a "transaction in goods." *Kaplan v. Cablevision of PA, Inc.*, 448 Pa.Super. 306, 671 A.2d 716 (1996) (*en banc*). In addition, "when the transaction involves predominantly the rendition of services, the fact that tangible, movable goods may be involved in the performance of the contract does not bring the contract under the code." *Stephenson v. Greenberg*, 421 Pa.Super. 1, 10, 617 A.2d 364, 368 (1992) (quoting *Whitmer v. Bell Telephone Company of Pennsylvania*, 361 Pa.Super. 282, 288–89, 522 A.2d 584, 587 (1987)). Here, the primary purpose of the contract was to provide Foster with the service of cleaning and coating components for bridge construction.

Stage I.[7] The trial court, therefore, deduced that because Foster had no legitimate reason for failing to perform, Foster breached the Lane agreement.

The crux of Foster's contention is that although it may have breached the Lane agreement by withholding a small percentage of the sums due, this act was not a material breach.[8] It is axiomatic, Foster asserts, that Lane was required to perform on Stage II of the Agreement. We agree. There has been no explicit finding that Foster's actions constituted a **material breach** of the agreement. *See Borough of Greentree, supra; Schlein, supra.* Moreover, applying the materiality test as set forth in the Restatement § 241, and adopted in *Jennings, supra,* we note that Foster failed to pay only $7,082.22 out of a $133,922.40 purchase order. *See Oak Ridge Const. Co., supra.* This amounts to a withholding of approximately 5% of the total contract price. *See* Calamari & Perillo, *supra* ("It is apparent that the ratio of the part performed to the part to be performed is an important question in determining ... material breach."). Additionally, it is uncontradicted that Foster planned to remit the monies due once it received assurance from Lane that Lane could perform Stage II of the agreement. *See* 3A Corbin on Contracts § 719 (time is generally not of the essence unless the parties have expressly manifested such an intent). Under these circumstances

we conclude that the trial court erred in finding that Foster materially breached the Lane Agreement. Lane, therefore, was not entitled to suspend its responsibilities under the Lane Agreement. *Borough of Greentree, supra; Schlein, supra.*

In light of our conclusion that Foster's breach did not materially impair the Lane Agreement, we must now determine whether Lane's failure to give Foster assurance of performance of Stage II of the Agreement amounted to an anticipatory breach. "Anticipatory breach of a contract occurs whenever there has been a definite and unconditional repudiation of a contract by one party communicated to another. A statement by a party that he will not or cannot perform in accordance with the agreement creates such a breach." *Oak Ridge Const. Co.,* 351 Pa.Super. at 38, 504 A.2d at 1346. (1985) (citations omitted). *See* Restatement (Second) of Contracts § 250 (1981); *Jonnet Develop. Corp. v. Dietrich Industries,* 316 Pa.Super. 533, 463 A.2d 1026 (1983). *See also AEL Industries Inc. v. Loral Fairchild Corp.,* 882 F.Supp. 1477 (E.D.Pa.1995). Comment b to section 250 of the Restatement (Second) explains the nature of a repudiatory declaration:

In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that

7. Evidence of Foster's intent to permit Lane to cure is found in Foster's February 9, 1993 letter to Lane stating in pertinent part:

Based upon your verbal authorization at the jobsite meeting of Feb. 5, 1993, Foster has advised Hammond to proceed with field repairs.
It is L.B. Foster's intent to hold Lane Enterprises responsible for all costs incurred to correct this deficiency, and will withhold payment of monies due to Lane Enterprises until corrections are completed and the grid flooring is accepted by ODOT.

8. Foster preliminarily contends that the trial court incorrectly found that it breached the agreement at all, because its letter dated February 9, 1993, permitting Lane to cure its defective performance provided that the money owed would not be remitted until the **"corrections are completed and the grid flooring is accepted by ODOT."** (emphasis added). Foster notes that it received a letter from Hammond detailing the

expenditures to repair the unacceptable coating and advising Foster that ODOT refused to accept the coated components until the bridge was completely erected. Foster argues, therefore, that it was justified in retaining the $7,082.22 owed to Lane, since its agreement to cure specified that Foster would not release funds until acceptance by ODOT. The trial court dismissed this contention, explaining that the letter when read together with the testimony of Foster's operations manager, John Paczan that he told Lane representative Bob Garretson Foster would release the money upon the completion of the repairs belies Foster's conclusion. Moreover, the trial court notes that although Hammond told Foster that ODOT refused to approve the coated bridge components until the entire project was completed, ODOT explicitly permitted Hammond to begin construction, thus presumably accepting the components. Based upon our standard of review, we cannot conclude that the trial court erred in finding that Foster agreed to remit the remaining moneys due under stage I of the Contract.

the party will not or cannot perform. Mere expression of doubt as to willingness or ability to perform is not enough to constitute a repudiation ... However, language that under a fair reading amounts to a statement of intention not to perform except on conditions which go beyond the contract constitutes a repudiation.

Restatement (Second) of Contracts § 250, cmt. b (1981). *Accord Shafer v. A.I.T.S., Inc.,* 285 Pa.Super. 490, 428 A.2d 152 (1981) ("to be effective, a renunciation must be absolute and unequivocal.").

 Although a statement by a party concerning its ability to perform may not be sufficiently absolute to constitute a repudiation of the contract, such a statement may warrant the other party to demand adequate assurance of performance, the failure of which may be treated as repudiation. *Jonnet,* 316 Pa.Super. at 544–546, 463 A.2d at 1032. The Restatement explains:

(1) where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance

(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurances of due performance as is adequate in the circumstances of the particular case.

Restatement (Second) of Contracts § 251 (1981). If a party is warranted in demanding adequate assurances of performance, therefore, and none is forthcoming, the requesting party may treat the failure to respond as a repudiation of the contract. *Id. See Jonnet,* 316 Pa.Super. at 544–546, 463 A.2d at 1032.

The rationale for demanding adequate assurance of performance is explained as follows: Although a party does not ordinarily have the right to demand reassurance that the other contracting party will perform, a reasonable belief that the other contracting party will not or cannot perform permits the contracting party to demand adequate assur-

ance. Restatement (Second) of Contracts § 251 cmt. a (1981). The rule is closely related to the duty of good faith and fair dealing present in every contract. *Id.* Whether a party has a reasonable belief that the other party cannot perform is determined by the totality of the circumstances surrounding the agreement. Restatement (Second) of Contracts § 251 cmt. c (1981). It should be noted, however, that "minor breaches may give reasonable grounds for a belief that there will be more serious breaches, and the mere failure of the obligee to press a claim for damages for those minor breaches will not preclude him from basing a demand for assurances on them." *Id.* Moreover, "conduct by a party that indicates doubt as to his willingness to perform but that is not sufficiently positive to amount to a repudiation may give reasonable grounds for such a belief." *Id.*

 In the present case, we must first illustrate the circumstances out of which the Lane Agreement was created. The ultimate goal was to construct a bridge in Ohio. To that end, Hammond contracted with Foster for the manufacture of components and Foster contracted with Lane to clean and coat the components. In order to shield itself from liability under the Hammond Agreement, therefore, Foster required that the coating be approved by an ODOT engineer as a condition of the Lane Agreement. The contract did not, however, specify the level of contamination permitted between the coating and the steel components.

The evidence at trial showed that Lane had experienced difficulties in the cleaning and coating of the Stage I bridge components. In fact, after the coated components were shipped to the bridge construction site, ODOT engineers refused to approve the components until certain modifications were made. Due to the problems that Lane experienced, Lane's quality assurance manager wrote a letter to Foster explaining that it could not meet ODOT's claimed requirement of zero percent contamination because that level was unattainable. After receiving this letter Foster did not request assurance of performance nor did Foster claim that Lane

had breached the contract. Rather, Foster made an agreement with Lane that the Stage I components would be modified by another firm and it would deduct the cost from the amount it owed Lane. The modifications were made by another company. Subsequent to the modifications, ODOT permitted Hammond to commence construction, thus presumably approving the coated components for use. Only after the repairs were made on the Stage I components did Foster demand assurance of performance by Lane on Stage II of the agreement.

Without citing any authority, the trial court found that because Foster had agreed that Lane would be responsible for the cost of the repairs, Foster lost its opportunity to demand assurance of performance on Stage II. We fail to see how Foster's agreement to permit Lane to pay to cure the defects resulted in a loss of Foster's right to demand assurance of performance with regard to Stage II. As comment c to the Restatement (Second) § 251 explains: mere failure of the obligee to press a claim for damages for minor breaches will not preclude him from basing a demand for assurances. A material condition of the Lane Agreement was ODOT's approval of the coated components. Due to the difficulties that Lane experienced performing Stage I of the Agreement, coupled with Lane's lukewarm expression of its ability to perform, we find that Foster had reasonable grounds to demand assurance of performance.[9] *Jonnet, supra.* Foster requested that Lane provide some assurance that it would complete Stage II. Lane refused to give such assurances and thus we find that Lane, not Foster, materially breached the agreement. *Id.*

▮▮ Having concluded that Lane materially breached the Lane Agreement, our final task is to instruct the trial court on the proper allocation of damages. Here, as a direct result of Lane's breach, Foster was required to pay another contractor $42,055.00 more than it would have paid Lane to complete Stage II of the Lane Agreement. Because this amount flowed directly from the breach, Lane is required to pay Foster this amount in damages. *See Shafer, supra; see also Keystone Floor Products Co. v. Beattie Mfg. Co.*, 432 F.Supp. 869 (E.D.Pa.1977) (breaching party must pay for any damages that naturally and ordinarily result from the breach as well as any other reasonably foreseeable damages so long as they were within the contemplation of the parties at the time of the contract). Foster, however, failed to remit $7,082.22 owed to Lane from Stage I of the Lane Agreement, which also was a breach. Accordingly, Foster is entitled to recover from Lane the cost of finding another contractor to complete stage II ($42,055.00) which is to be offset by the amount that Foster withheld from Lane for completing Stage I ($7.082.22). Foster is entitled, therefore, to a net award of $34,972.78. On remand, the trial court shall enter an order consistent with this opinion.

Order reversed. Case remanded. Jurisdiction relinquished.

FORD ELLIOTT, J., files a Dissenting Statement.

FORD ELLIOTT, Judge, dissenting:

I respectfully dissent because I find appellant has waived the issues raised on appeal. Pa.R.Civ.P. 227.1(c)(2) provides:

**Rule 227.1. Post–Trial Relief**

. . . .

(c) Post-trial motions *shall be filed* within ten days *after* .

. . . .

 (2) notice of nonsuit or *the filing of the decision* or adjudication *in the case of a trial without jury* or equity trial.

Pa.R.Civ.P. 227.1(c)(2), 42 Pa.C.S.A. (emphasis added). Aside from the clear language of the Rule, the supreme court further evidenced its intent that this Rule be mandatory

---

**9.** The trial court also indicated that ODOT's failure to provide approval to the coated components for Stage I was not a reasonable ground upon which to demand assurance of performance. Specifically, the trial court found persuasive the testimony of defense expert Paul Krauss that ODOT's understanding of the contamination was faulty. Even assuming that ODOT's engineers were mistaken regarding the proper contamination specifications, only a Monday Morning Quarterback could conclude that Foster's concerns were unreasonable.

when it deleted Rule 227.4(b), which allowed the parties to waive post-trial practice by filing a "waiver in writing of the right to file post-trial motions signed by all parties." As the 1995 Explanatory Comment indicates, "Present Pennsylvania policy is to require the parties to give the trial court the opportunity to correct error through post-trial practice. It follows that post-trial practice should not be subject to waiver." Pa. R.Civ.P. 227.1, Explanatory Comment–1995 I.b.

Instantly, a non-jury trial was held from August 22–23, 1996. Appellant filed a post-trial memorandum on September 5, 1996, and appellee filed a post-trial brief on September 6, 1996. These documents contain the parties' respective legal arguments in support of their positions relative to the contract dispute. (S.R.R.) On November 20, 1996, the trial court filed its memorandum and verdict. Nothing in this verdict indicates that it is a final order, nor did the trial court enter judgment. Appellant may indeed be raising the same issues on appeal that were argued in the post-trial memoranda *before* the decision (verdict) by the trial court. Likewise, these issues may indeed have already been addressed by the trial court in its memorandum in support of the verdict. Nevertheless, our supreme court has mandated that the trial court have an opportunity to correct errors *after* reaching its decision.

Although I agree with the majority that there may be cases in which the trial court enters a judgment from a non-final order, thereby precluding the parties from filing post-trial motions and necessitating a timely appeal to this court, this is not such a case.

I do not believe this court may ignore a clear mandate of our supreme court and find that the trial court's opinion constituted a *de facto* final order. I do not, therefore, agree with the majority that we may forgive appellant's failure to file post-trial motions before taking an appeal. As a result, I would find appellant's issues waived, and must respectfully dissent.