WIDMER ENGINEERING,
INC., Appellee,

v.

Michael H. DUFALLA, Appellant.

Widmer Engineering, Inc., Appellant,

v.

Michael H. Dufalla, Appellee.

Superior Court of Pennsylvania.

Argued June 18, 2003.
Filed Oct. 21, 2003.
Reargument Denied Dec. 19, 2003.

Peter M. Suwak, Washington, for Dufalla.

David R. Johnson, Pittsburgh, for Widmer Engineering.

Before: HUDOCK, LALLY–GREEN and CAVANAUGH, JJ.

CAVANAUGH, J.

¶ 1 These are consolidated appeals from judgment in the amount of $139,420.86 entered in favor of Michael H. Dufalla (seller) and against Widmer Engineering, Inc., (buyer) following verdict in a non-jury trial on competing breach of contract claims arising from the sale of an engineering firm, Engelhardt–Power and Associates, Inc. We affirm in part, reverse in part, and remand for further proceedings.

¶ 2 The relevant facts, as gleaned from the record, show that Dufalla, a civil engineer, had been the sole shareholder of Engelhardt, a closely held corporation providing engineering, design and surveying services for public and private construction projects. In 1993, Dufalla was appointed by Governor Robert Casey to the post of District Engineer for the State Department of Transportation. In order to avoid any potential appearance of conflict of interest, Dufalla decided to sell his engineering firm and initially approached Harvey Treschow, its corporate manager, about any possible interest he might have in purchasing it. Although Treschow was interested, negotiations stalled and Dufalla sought other potential buyers while Treschow continued on in his position as corporate manager.

¶ 3 On February 28, 1995, Dufalla entered into an agreement to sell Engelhardt to Widmer Engineering. Closing was held that date. The agreement of sale provided that "[a]t closing, Corporation, through its officers, will issue a termination notice to Corporation's present manager." When Engelhardt became a wholly-owned subsidiary of Widmer the following day, March 1, 1995, Harvey Treschow had not been terminated from employment by Dufalla or by any other officer of Engelhardt. Moreover, Engelhardt was staffed by persons who were not employees of Engelhardt, but who were contract employees of Technical Personnel Services, Inc. (TPSI), a temporary employment agency. Harvey Treschow, in addition to being Engelhardt's corporate manager, was the president and chief shareholder of TPSI, which had contracted with Engelhardt to provide Engelhardt with personnel.

¶ 4 Paragraph 7(h) of the sales agreement between Dufalla and Widmer provided that:

The Corporation [Engelhardt] has not entered into, and is not subject to, any: (i) written contract or agreement for the employment of any employee of the business; (ii) contract with any labor union or guild; (iii) pension, profit-sharing, retirement, bonus, insurance, or similar plan with respect to any employee of the business; or (iv) similar contract or agreement affecting or relating to the corporation.

¶ 5 The contracts between Engelhardt and TPSI and between TPSI and its employees had not been disclosed by seller to buyer and buyer did not discover the existence of those contracts during its due diligence period. When it learned of the contracts, buyer sought to hire TPSI's employees as its own. Treschow demanded, as per TPSI's contract with Engelhardt, that Engelhardt reimburse TPSI in an amount equal to 20% of each individual TPSI employee's annual salary in order to "buy out" the employment contracts. Engelhardt/Widmer declined to pay. TPSI subsequently filed suit against seller and Engelhardt. The suit eventually settled for $8000. Buyer spent $22,486.35 in attorneys' fees defending the action and contributed $3000 to the settlement amount. When buyer later sued seller for breach of the sales agreement, it claimed, among other things, entitlement to $25,486.35 in damages to cover its attorneys' fees and settlement contribution in the TPSI suit under the following indemnification provision contained in the agreement:

Each party hereto shall indemnify and hold the other party harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, incurred or required to be paid by such other party by reason of any breach or failure of observance or performance of any representation, warranty, covenant or other provision of this agreement by such party.

¶ 6 Buyer's suit against seller also alleged that seller materially breached the sales agreement by failing to pay ⅔ of Engelhardt's corporate taxes, a requirement which was set forth among others in the following provision of the sales agreement:

4. *Adjustments to Purchase Price.* If the face amount of the Accounts Receivable and Payroll Account on the closing date shall be greater or less than $100,000.00, then the amount to be paid pursuant to Article 3 above [Purchase Price] shall be increased or decreased as the case may be, by the amount by which the face total amount of the Accounts Receivable and Payroll account is greater than or less than $100,000.00. These amounts do not include any reserve for taxes set aside as required under Article 7(*l* ) hereof. After the closing, Seller shall transfer and deliver to Purchaser all cash and other property which Seller may receive relating to the Accounts Receivable after the closing date. All receivables not collected within one year of closing will be deducted from any amount due Seller by Purchaser. Any receivables not collected within one year will be assigned by Purchaser to Seller. Any liabilities of the Corporation, to the extent that such liabilities in the aggregate exceed the lien on the building where the corporation's offices are located, and which is estimated to be approximately $60,000.00 will be deducted from the payment due to Seller under Article 3 hereof. In addition, Seller will pay to Purchaser an amount equal to two-thirds (⅔) of the corporate income taxes which would be due from the corporation for the fiscal year beginning July 1, 1994 and ending July 30, 1995, without the application of the existing carry forward credit. Also, Seller will pay to Purchaser the amouhnt [sic] of any checks issued prior to closing in payment of the T1010 Theomat and presented for payment after closing. Purchaser shall reimburse Seller for any bills bpaid [sic] by Seller prior to closing but applicable to the period after closing. The aforesaid adjustments will be made by the parties on March 15, 1996.

¶ 7 As the above provision in the parties' agreement shows, the purchase price of Engelhardt was not for a fixed amount. On the date of closing, seller, who was seeking approximately $600,000 in value in return for all his shares of the corporation, received cash in the amount of $181,500. Sixty thousand dollars of that amount was via check from buyer to seller. Seller additionally received $121,500, directly out of Engelhardt's operating funds.[1] As will be discussed in greater detail below, seller also received title to the building which housed Engelhardt,[2] and buyer promised that it would pay seller at least $120,000 plus 7.5% interest over a period of fifteen years for seller's covenant not to compete. Moreover, the parties agreed that adjustments to the purchase price would be computed one year after closing based upon

1. This deduction of funds left only approximately $1000 cash in the corporation. As of the date of closing, buyer was to begin recouping existing accounts receivable, *i.e.*, remuneration for work which had been completed and billed but for which payment had not been received prior to the change in ownership. Although not at issue herein, we note that at the time of sale, based on simple accounting principles, Engelhardt was apparently operating at the relatively low recoupment ratio of 50% for existing accounts receivable given the apparent 1:1 ratio of cash-on-hand vs. total amount of outstanding bills for work completed.

2. The building was valued at $110,000 and was subject to a $60,000 mortgage which buyer agreed to take over.

the amount of accounts receivable collected during that time.

¶ 8 During negotiations for the sale of the business, buyer decided that it was not interested in acquiring the building which Engelhardt owned and out of which it operated. Thus, the agreement of sale provided that upon closing, the corporation would tender a deed for the property to seller, who would then lease the building back to buyer in exchange for fixed rent of $1000 per month. The lease agreement was incorporated into and made part of the agreement of sale. Realizing that the transfer of the real estate would result in a capital gain for the corporation, the parties agreed, as per the lease agreement, that:

> Lessor [Dufalla] shall grant to lessee [Widmer] a credit in the amount of one half of the accrued corporate income taxes on the capital gain reportable because of the sale of real estate from the Corporation to Seller. This credit shall be applied to Rent payments due, beginning with the payment due March 1, 1995, until the credit is exhausted. For the purposes of this paragraph, the corporate income taxes referred to herein shall be 15% of the first $50,000.00, 25% of the next $25,000.00, and 34% of the next $25,000.00, of the amount by which the sum exceeds the depreciated basis of the building and land as shown on the corporation's books.

¶ 9 A covenant not to compete was also included in the agreement of sale which provided that, in exchange for seller's promise not to compete with buyer within Washington County for a period of five years, buyer would reimburse seller a minimum of $120,000 and up to a maximum of $270,000. The agreement provided, in pertinent part:

> . . . The Purchaser will pay the Seller for the said covenant not to compete an amount to be computed as follows: the sum of $120,000.00 plus a sum equal to the amount of the average annual billings of Corporation exceeding $527,000.00 during the period from July 1, 1995, until June 30, 2000, but not to exceed an additional amount of $150,000.00 (that is, the maximum payment shall be $120,000.00 plus $150,000.00 or $270,000.00). Payment for the covenant not to compete shall be made over a fifteen year period with the first payment due thirty days after closing. Payment for the first five years shall be at a fixed rate of interest of 7.5% per annum with the principal amount of $120,000.00. At the end of the fifth year, the increment, if any, shall be computed, and payment of the increment and accrued interest thereon from March 1, 1995, shall be made in installments for the remaining ten years with interest at the same rate. Payment of the amounts due as computed shall be in the form of a promissory note(s) given by Purchaser to Seller providing for monthly payments at the above rate and for the above terrm [sic] and including a confession of judgment clause which will provide for entry of judgment in the event of default.

¶ 10 Despite the agreement's provision that seller was to pay ⅔ of the corporate income taxes, he did not do so, and a penalty with interest was assessed to the corporation by the IRS which was paid by buyer, which also paid 100% of the corporate taxes. In March of 1996, the parties and their lawyers met for the apparent purpose of fixing the adjustments to the purchase price. Buyer presented seller with a tabulation of accounts receivable which had been collected and demanded payment from seller, per the agreement, for the difference between that amount and $100,000. Seller refused to pay.

¶ 11 Seller's contention at the meeting was that he had not been given sufficient or accurate figures for the amount of accounts receivable which had been collected subsequent to closing. Moreover, seller felt he was entitled to a credit for "unbilled" receivables, a type of account about which the agreement was silent, but which seller felt comprised "work in progress" at the time of the closing. Seller maintained that there were projects which had been started under his ownership but which had not been completed or billed until after ownership had been transferred. Seller maintained that although buyer received the full benefit of these "unbilled" receivables, there was no corresponding increment in the purchase price nor, alternatively, was credit given to seller in a corresponding amount as a set-off against purchase price adjustment payments for which he was responsible. Seller also maintained that he was being saddled with more than 100% of the corporate tax for the year in question by being required to pay 66% of it under the purchase price adjustment provision as well as being required to extend buyer a 50% credit toward the capital gains tax amount under the lease provision.

¶ 12 Buyer, on the other hand, considered seller's refusal to pay any amount toward the corporate taxes to be a material breach of the agreement which would excuse buyer from tendering any further payment to seller. Thus, buyer stopped further payments on the covenant not to compete, which had, up until that time, been made in the amount of approximately $2400 per month.

¶ 13 Buyer then brought suit to recover, among other things, amounts it paid in corporate taxes and to defend the TPSI suit as well as amounts seller owed as a purchase price adjustment based on accounts receivable collected. Seller counter-claimed, seeking, among other things, full payment under the non-compete clause. Trial of the matter was conducted, non-jury, before the Honorable David L. Gilmore in Washington County on April 23–24, 2001. David Widmer, buyer's president, testified that buyer's damages resulting from seller's breach of the agreement's provisions totaled $220,673.73 in principal amount.[3] Mr. Widmer further testified that he had calculated and added monthly interest at the rate of 7.5% onto the unpaid principal amount. He calculated that the interest owed on the principal was $90,257.28, and thus, claimed entitlement to a total damages award of $310,931.01.

¶ 14 However, the court found that the amount of interest had been improperly calculated as shown by the following exchange which took place at the conclusion of Mr. Widmer's direct testimony:

MR. JOHNSON [Widmer's counsel]: Those are all the questions I have of this witness your honor.

THE COURT: What is your claim for interest based on? Anything in the agreement, or just general?

MR. JOHNSON: It's based on the fact that there's a liquidated amount of damages due as of the adjustment date that's calculated from that date forward except with respect to the income tax payments and the rate of interest selected is based upon a reasonable rate of

---

**3.** In addition to the unpaid taxes, purchase price adjustments and legal costs incurred in the TPSI suit, buyer claimed damages for items such as missing computer software, costs in the nature of severance pay associat- ed with terminating Treschow's employment, costs of employee vacation buy-outs, employee vision plan expenses and costs for re-designing a public park project begun under seller's ownership.

interest since it's the same rate of interest set forth in the agreement regarding the covenant not to compete.

. . . .

THE COURT: Do these interest calculations reflect charging interest on interest?

WITNESS: Yes, there was interest accrued monthly,—if I can answer that.

THE COURT: Yes, but it's against the previous—

WITNESS: Principal and interest, yes.

THE COURT: Banks aren't allowed to do that, how can you do that?

WITNESS: Um—

MR. SUWAK [Dufalla's counsel]: They can try.

THE COURT: They get sued over that pretty often. Okay. Cross-examine.

¶ 15 The trial court announced its verdict with findings of fact and conclusions of law on December 6, 2001. Central to the court's resolution of the competing claims was its determination that while seller's failure to pay two-thirds of the corporate taxes was a breach of the agreement, the breach was not material because buyer nonetheless retained the benefit of the bargain it reasonably expected, *i.e.,* the purchase of an engineering firm. Thus, the court held that buyer was not excused from remitting payments under the non-compete provisions but was responsible for the remainder of payments due to seller thereunder. Because incomplete figures were presented at trial with respect to how much the average annual billings exceeded $527,000, the court's award to seller under the non-compete provision was limited to $120,000 plus interest. The court, however, directed the parties to present updated and complete data so that it might determine the supplemental amount due.

¶ 16 Both parties filed post-trial motions. The parties stipulated, post-trial, as per the court's ruling that the supplemental amount under the non-compete clause was due and owing, that the average annual billings of Engelhardt during the relevant period were $688,904.35 if subcontracts were included and that the annual average was $608,422.88 if subcontracts were not included.

¶ 17 The court announced its findings, conclusions of law and order disposing of the post-trial motions on October 3, 2002. The court concluded that seller was liable under the agreement to reimburse buyer for its legal fees arising from the TPSI lawsuit. The court found that seller was liable to buyer for the cost of missing computer software and for purchasing software licenses. It held that seller was liable for corporate tax in the amount of $46,354.67. It additionally found that seller owed buyer $45,107.01 as a purchase price adjustment under the agreement's provision regarding the amount by which the accounts receivable collected one year after the closing date were less than $100,000. The court did not grant buyer's request for interest on the amounts for which seller was liable.

¶ 18 The court found that buyer owed seller $144,200.31 on the unpaid portion of the base price of the non-compete provision ($120,000 at 7.5 % interest, the rate set forth in the contract, over fifteen years). To that amount the court added the sum of $111,956.48 which represented principal and contract interest on the average annual billings exceeding $527,000.[4]

4. The court accepted the stipulated figure of average annual billings without subcontracts, $608,422.88, as the basis for its calculation of the supplemental amount due under the non-compete clause.

¶ 19 Accordingly the court entered the following order:

AND NOW, this 3rd day of October, 2002, the Court finds for the Plaintiff, Widmer Engineering, Inc. on the Complaint in the amount of $130,180.31, and for the Defendant, Michael H. Dufalla, on the counterclaims in the amount of $269,601.17. As a result of these findings, the Court finds in favor of the Defendant and against the Plaintiff for the net amount of $139,420.86.

¶ 20 Both parties now appeal. Seller appeals at 2015 WDA 2002 and Buyer appeals at 2021 WDA 2002.

## I. *APPEAL AT 2021 WDA 2002*

¶ 21 Buyer raises the following questions for our review:

1. Whether Dufalla's failure to pay in excess of $91,000.00 due and owing to Widmer under the terms of the Agreement of Sale, coupled with other breaches of the Agreement, constituted a material breach, which excused Widmer from further performance?

2. Whether the court below properly awarded interest to Dufalla at the 7½ % contract rate while at the same time refusing to award interest at the legal rate on amounts owed by Dufalla to Widmer[?]

¶ 22 Buyer's first issue challenges the trial court's conclusion that seller's breach of contract was not a material breach. When examining a trial court's conclusions in a non-jury trial, our standard of review is well-settled: "we [may] reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record." *Skurnowicz v. Lucci,* 798 A.2d 788, 793 (Pa.Super.2002) (quoting *Wallace v. Pastore,* 742 A.2d 1090, 1092 (Pa.Super.1999)).

¶ 23 The thrust of buyer's contention is that seller's failure to pay monies due under the agreement of sale, including corporate taxes and adjustments to the purchase price, was a material breach of the contract such that seller was no longer required to perform its obligations under the contract, *i.e.,* to pay buyer for his promise not to compete. We begin our analysis by noting a settled principle of contract law: a material breach by one party to a contract entitles the non-breaching party to suspend performance. *See Berkowitz v. Mayflower Securities, Inc.,* 455 Pa. 531, 317 A.2d 584, 586 (1974) (citing 6 *Williston on Contracts* § 846 (3d Ed.1962) and Restatement of Contracts, § 275 (1933)). This court, in *Lane Enterprises v. L.B. Foster Co.,* 700 A.2d 465 (Pa.Super.1997), *reversed on other grounds,* 551 Pa. 306, 710 A.2d 54 (1998), explained in well-reasoned and scholarly fashion the relevant areas of inquiry under the above principle, with which we are in full accord:

"When performance of a duty under a contract is due, any nonperformance is a breach." Restatement (Second) of Contracts § 235(2) (1981). *See Barnes v. McKellar,* 434 Pa.Super. 597, 644 A.2d 770 (1994); *Camenisch v. Allen,* 158 Pa.Super. 174, 44 A.2d 309 (1945). If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract. *Oak Ridge Const. Co. v. Tolley,* 351 Pa.Super. 32, 504 A.2d 1343 (1985). If, however, the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective. *Cimina v. Bronich,* 517 Pa. 378, 537 A.2d 1355 (1988); *Borough of Greentree to Use of Castelli Const. Co. v. Tortorete,* 205 Pa.Super. 532, 211 A.2d 76 (1965); *Schlein v. Gross,* 186 Pa.Super. 618, 142

A.2d 329 (1958). *Accord* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 11–22 (2d ed.1977). In other words, the non-breaching party does not have a right to suspend performance [if the breach is not material].

..."Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end 'is a question of degree; and it must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'" *Gray v. Gray*, 448 Pa.Super. 456, 468, 671 A.2d 1166, 1172 (1996) (citing *2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies*, 319 Pa.Super. 228, 242–43, 466 A.2d 132, 139 (1983) (citations omitted)). In determining materiality for purposes of breaching a contract, we consider the following factors:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981). *Accord Jennings v. League of Civic Organizations of Erie County*, 180 Pa.Super. 398, 119 A.2d 608 (1956).

*Id.* at 471.

¶ 24 Here, the trial court concluded in its well-reasoned opinion that despite seller's failure to pay monies due and owing under the contract, "[buyer] was not deprived of the benefit [it] reasonably expected, i.e., the purchase of an engineering firm." Thus, the trial court held that seller's breach was not material and that buyer was obligated to continue its payments under the non-compete provision of the agreement.

¶ 25 In considering the relevant factors outlined above, we find no error in the court's conclusion that seller's breach was not a material breach. Simply put, despite seller's failure to pay taxes and amounts owed as adjustments to purchase price, buyer retained ownership and operational control of Engelhardt which generated gross income for buyer in excess of $600,000 during every year after acquisition. Clearly, buyer was not deprived of the benefit of ownership of the firm. Further, we conclude that any benefit of which buyer was deprived as a result of seller's contractual breach was adequately compensable by the award of monetary damages.

¶ 26 Moreover, if buyer's non-performance under the remainder of the contract were to be excused, then seller would forfeit a substantial portion of the monies due him under the agreement of sale vis-à-vis its non-compete provision.[5] Weighing these consequences, we conclude that the degree of seller's breach was not such that buyer's obligations for payment under the

---

5. No claims have been made below or on appeal that seller failed to adhere to his obligations as contained in the non-compete clause.

contract may be suspended. The contract was substantially performed by seller who delivered all his shares and relinquished control of Engelhardt. Accordingly, we conclude that the court properly found buyer's obligations for payment under the contract's non-compete provisions to be enforceable and we reject buyer's claim that the court erred in awarding seller interest at the rate specified in the contract for monies due under the non-compete clause.

¶ 27 Buyer next claims that the court should have computed and added legal interest onto approximately $91,000 of the damages it awarded to buyer. Buyer is essentially claiming entitlement to prejudgment interest on the damages awarded for seller's failure to make payment on purchase price adjustments and to pay corporate taxes. After careful review, we agree.[6]

¶ 28 We first note although the court did not explain why it denied buyer's request for interest, we may presume, from the record, that at least part of the court's reason for doing so may have been that buyer requested compound interest at a rate of 7 ½ percent. Prejudgment interest is limited to simple interest at no more than the legal rate. *Spang & Co. v. USX Corp.*, 410 Pa.Super. 254, 599 A.2d 978, 984 (1991). Buyer's erroneous computation of prejudgment interest due did not change the fact that buyer was entitled to prejudgment interest under well-settled principles of contract law.

¶ 29 It is well established that in contract cases, prejudgment interest is awardable as of right. *Somerset Comm. Hospital v. Allan B. Mitchell & Assocs.*, 454 Pa.Super. 188, 685 A.2d 141 (1996) (citing *Thomas H. Ross Inc. v. Seigfreid*, 405 Pa.Super. 558, 592 A.2d 1353 (1991)). Our supreme court has held:

> For over a century it has been the law of this Commonwealth that the right to interest upon money owing upon contract is a legal right. *West Republic Mining Co. v. Jones and Laughlins*, 108 Pa. 55 (1884). That right to interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment.

*Fernandez v. Levin*, 519 Pa. 375, 548 A.2d 1191, 1193 (1988). Moreover, there is no requirement that the damages be liquidated and no exception to the right to prejudgment interest has been recognized simply because the amount of damages must be determined at trial. *Spang & Co. v. USX Corp.*, 599 A.2d at 984. *Cf. Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584, 595 (1984) ("In claims that arise out of a contractual right, interest has been allowed at the legal rate from the date that payment was wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation.") The basic premise underlying the award of prejudgment interest to a party centers on the fact that the breaching party has deprived the injured party of using interest accrued on money which was rightfully due and owing to the injured party. *Somerset Hospital*, 685 A.2d at 148.

¶ 30 In the instant case, the court properly determined that seller breached the agreement when he withheld payment due

---

**6.** The court awarded buyer a total amount of $130,180.31 in damages. The total damages award included $45,107.01 on buyer's claim regarding downward adjustment of purchase price based on accounts receivable collected one year after closing; $46,354.67 for corporate taxes; $25,486.35 for costs associated with the TPSI suit; $11,060.00 for missing software; 620.62 for software licenses and $1,551.66 for equipment (T1010 Theomat). The court awarded no interest on any of these amounts.

to buyer for corporate taxes and purchase price adjustments based on accounts receivable collected. We conclude that buyer is entitled to interest on those amounts from the time seller withheld payment.

¶ 31 We remand for a hearing to determine the proper amount of prejudgment interest to which buyer is entitled.

## II. *APPEAL AT 2015 WDA 2002*

¶ 32 Seller presents the following questions for our review, which we will address *seriatim:*

A. Whether the lower court erred in failing to include subcontracts in the gross billings to decide the amount due on the supplemental portion of the covenant not to compete?

B. Whether the lower court erred in granting the plaintiff's claim for indemnification of attorney's fees and settlement costs of the suit with TPS, since Defendant Dufalla had breached no warranty and had disclosed all information known to him at the time of the transfer and where the damages, if any, were caused by Widmer's own actions?

C. Whether the lower court erred in computing the amount of corporate tax liability to be paid by Dufalla?

D. Whether the lower court erred in denying Dufalla's claim for unbilled accounts receivable?

¶ 33 Seller first argues that the court erred in accepting the stipulated figure of $608,422.88 as the average annual billing amount for purposes of determining buyer's obligation for payment on the supplementary portion of the non-compete provision. Seller argues that the court should have accepted the stipulated figure of

$688,904.35 as the average annual billing amount.[7]

¶ 34 The court concluded that "[s]ince there is no specific language, the plain language of the covenant not to compete controls and the average annual billings for the purposes of calculation is the gross amount without subcontracts." The language contained in the covenant not to compete required buyer to pay seller:

the sum of $120,000.00 plus a sum equal to the amount of the average annual billings of Corporation exceeding $527,000.00 during the period from July 1, 1995, until June 30, 2000, but not to exceed an additional amount of $150,000.00 (that is, the maximum payment shall be $120,000.00 plus $150,000.00 or $270,000.00).

. . . .

It is the understanding of the parties that all work negotiated at the Engelhardt–Power and Associates, Inc. office will be invoiced through Engelhardt–Power and Associates, Inc.

¶ 35 Buyer's position, which the court apparently accepted, is that on some of its jobs, it subcontracted portions of the work to be performed out to other firms. Thus, on those particular jobs, portions of the proceeds Engelhardt received from its customers for the completed work merely "passed through" Engelhardt, because it was required to pay the subcontractors for the work the subcontractors performed.

¶ 36 Seller's position, on the other hand, is that buyer, Widmer Engineering Inc., is itself an engineering firm which operates independently of Engelhardt. Seller contends that the agreement's provision requiring all work to be "invoiced through Engelhardt" reflected seller's concern that

7. The parties stipulated that the higher amount represented the average annual billings of Engelhardt "including subcontracts" while the lower figure represented the average annual billing "without subcontracts."

buyer could manipulate the annual average billings by essentially subcontracting work to itself, *i.e.*, by performing subcontracted work under the aegis of Engelhardt's corporate parent. Seller additionally contends the agreement's language, *i.e.*, "a sum equal to the amount of the average billings of Corporation exceeding $527,000.00," is clear and does not refer to receipts or proceeds, but to billings. The language does not exclude any amounts billed by Engelhardt or limit those amounts, for purposes of calculation, to actual proceeds received. Thus, seller posits that the sum of the "annual billings" include all amounts billed, regardless of whether the proceeds of the billings merely "passed through" Engelhardt on the way to a subcontractor.

▪ ¶ 37 The issue raised is, at its core, one of contract interpretation. Our review of such questions is plenary and we are free to draw our own inferences. *County of Del. v. J.P. Mascaro & Sons,* 830 A.2d 587, 591 (2003) (citing *Liddle v. Scholze,* 768 A.2d 1183 (Pa.Super.2001)).

> The primary objective of a court when interpreting a contract is to ascertain the intent of the parties. *See Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Board,* 559 Pa. 56, 739 A.2d 133 (Pa.1999). When "a written contract is clear and unequivocal, its meaning must be determined by its content alone." *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347, 351 (1973) (quoting *East Crossroads Center, Inc. v. Mellon–Stuart Co.,* 416 Pa. 229, 205 A.2d 865, 866 (1965)). Courts are not to assume that a contract's language was chosen carelessly or that the parties were ignorant of the meaning of the language they utilized. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 662 (1982).

*Seven Springs Farm, Inc. v. Croker,* 569 Pa. 202, 801 A.2d 1212, 1215 (2002).

¶ 38 The language of the agreement does not specifically address whether subcontracted work should be included in determining the amount of annual average billings exceeding $527,000. The court, however, found that the "plain language" of the agreement dictated that the average did not include billings for work Engelhardt had subcontracted:

¶ 39 There was no evidence presented at trial regarding this issue. Attached to the post-trial stipulation is a document listing all amounts billed by Engelhardt, including subcontracts. The list, however, does not note the name(s) of the subcontracting firm(s). It merely lists the amount billed for the subcontracted work.

▪ ¶ 40 We conclude that the contract provision at issue reflects the parties' intent to tie the value of the non-compete clause to the amount of business generated by Engelhardt for buyer's benefit. Accordingly, we agree with seller that if any of the work contained on the Engelhardt billing list was subcontracted to another firm owned or operated by buyer, the corresponding billing should count toward the average annual billings total. On the other hand, we find that the agreement's language would permit deduction of amounts from the gross annual billings which were subcontracted to firm(s) other than those owned or operated by buyer since those amounts would merely pass through Engelhardt and be of little or no benefit to buyer. This interpretation of the provision at issue requires remand for a hearing to determine which portions of the subcontracted work, if any, were awarded by Engelhardt to entities also under the control of buyer. Any subcontract amounts so awarded shall be counted toward the annual average billings of Engelhardt for

purposes of determining the supplementary value of the non-compete provision.

¶ 41 Seller next claims that the court erred in granting buyer's claim for attorneys' fees and settlement costs related to the TPSI suit under the indemnification provision contained in the agreement of sale. His argument is two-fold. Seller posits 1) that he breached no warranty, representation or covenant in the agreement of sale relating to the employment status of Engelhardt's personnel because he disclosed to buyer that Engelhardt was staffed by independent contractors who were employees of TPSI, and 2) that the indemnification provision should not protect buyer from its own "wrongful conduct," which seller defines as buyer's "refus[al] to negotiate [a settlement of the TPSI suit] in good faith" or to settle the TPSI suit "for a low amount early." Instead, seller claims, buyer "chose to run up legal fees of $22,000[.]"

¶ 42 We disagree.

¶ 43 First, the court found as fact that buyer was unaware that Engelhardt's personnel were temporary employees of TPSI and our review of the record shows that the court's finding was supported by competent evidence. The agreement of sale provided that Engelhardt had "not entered into, and is not subject to, any: (i) written contract or agreement for the employment of any employee of the business[.]" Joseph and David Widmer both testified at trial that they were completely unaware, prior to assuming control of Engelhardt, of the existence of TPSI or that a contractual relationship existed between Engelhardt and TPSI. Seller's own testimony regarding that relationship was that he believed that any agreement between Engelhardt and TPSI for the provision of employees was only an "oral" agreement. We will not disturb the court's finding which was supported by the evidence and

we decline seller's invitation to retry the claim on appeal.

¶ 44 Second, we conclude that the court committed no error in holding that the indemnification clause applied. "In interpreting the scope of an indemnification clause, the court must consider the four corners of the document and its surrounding circumstances." *County of Del. v. J.P. Mascaro & Sons*, 830 A.2d 587, 591 (quoting *Deskiewicz v. Zenith Radio Corp.*, 385 Pa.Super. 374, 561 A.2d 33 (1989)). The clause in question broadly indemnified each party against the other for costs of litigation and damages resulting from the other party's breach. Despite seller's ambiguous claim to the contrary, this is not a case in which buyer sought indemnification for its own wrongdoing. *See Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 588 A.2d 1 (1991) (absent express terms to the contrary, indemnification does not require a party to assume liability for the indemnitee's own negligence); *see also Greer v. City of Philadelphia*, 568 Pa. 244, 795 A.2d 376 (2002) (same). In short, seller breached the warranty that no employment contracts existed; when buyer incurred legal costs and damages to a third party as a result of their existence, seller became liable to buyer for its damages under the indemnification provision.

¶ 45 Seller's final two contentions on appeal are that the court erred in computing the amount of corporate tax due and in failing to give seller a credit for the so-called "unbilled" receivables that remained with Engelhardt at the time of transfer of ownership, which seller maintains amounted to $66,800. We disagree.

¶ 46 After careful review, we are satisfied that the court's computation of the agreement's provisions regarding seller's obligations for corporate tax was accurate.

Seller continues to insist that the agreement provided that he only pay ⅔ of the corporate tax exclusive of the tax on capital gains. This is simply untrue. The agreement provides that seller is liable for ⅔ of the corporate tax for the relevant tax year. The provision does not exclude taxes on capital gains. Moreover, seller's argument that the 50% credit he gave to buyer in rent set-offs indicates that capital gains taxes were intended to be a separate and distinct obligation for the parties to share equally is unavailing. The evidence showed that buyer was uncomfortable paying even ⅓ of the corporate taxes knowing that the lion's share of the amount due would be based on a capital gain which the corporation would not realize since it was, in fact, giving the property away. Seller himself testified that he then proposed the 50% rent set-off against buyer's ⅓ obligation in order to "sweeten the pot."

¶ 47 Finally, seller's claims with respect to a separate category of "unbilled receivables," or "work in progress," or jobs contracted for but unfinished and unbilled prior to the transfer of ownership, are dismissed. The contract is completely silent about such accounts and we conclude that seller can make no legitimate claim for them. Seller testified that, whatever their value, he left such accounts with Engelhardt as part of the sale because the corporation's cash accounts were essentially depleted at the time of transfer and he wanted buyer to have some liquidity available. It is clear that seller never expected reimbursement or credit for any amounts designated as "unbilled receivables." Seller testified:

> One of the values we had was the work being done. I know when you plan something—and we do that constantly—we plan and try to get 100% planning, you never hit that 100%. There's always something that happens and you

never achieve that. You in your best planning and the best laid plans of mice and men, you lay out a plan and there's going to be things that you can't foresee. When you have a firm that has been in operation since 1955 there's things that you're going to miss. Joe [Widmer] and I talked and said there are going to be things we're going to miss; there's going to be things that you're going to need to start working with. There's going to be bills coming in, etcetera, you're not going to have any time to generate work from March 1st. So you're going to need money to operate. You're going to need to pay your bills. You're going to need money to pay a lot of things. These unbilled receivables are going to help you until you're on your feet and operating, and these unbilled receivables are going to cover anything unforeseen. There's always that 10%, it's going to cover that. Those unbilled receivables will cover that.

¶ 48 Moreover, in explaining why the agreement of sale didn't include any provisions regarding the "unbilled receivables," seller testified that his attorney, who helped draft the agreement, was concerned

> about this unbilled receivable, work in progress item. He said we need an exhibit for that [to attach to the agreement of sale]....[I] said, "Lynn, it's troublesome. It's hard to do. You're talking a lot of work and I don't have time for all that work." I said: "Joe and I negotiated. We know there's unbilled receivables there. I'm going to leave those unbilled receivables in the firm so that he has money to operate from and cover incidentals that we didn't cover in this agreement." We have a large complex organization and we cover that organization in about a 10 or 11 page agreement. There's a lot of things not in there. There's a lot of general state-

ments. There are things that are going to happen. It's human nature. We're not God.

¶ 49 Seller's claim for reimbursement of unbilled receivables is dismissed.

¶ 50 In summary, we conclude that seller's breach in failing to pay corporate taxes and purchase price adjustments was a breach of the agreement, but not a material breach. We affirm the court's award to buyer for damages arising from seller's breach and remand for the proper calculation of prejudgment interest. Further, we conclude that the court did not err in finding that seller was entitled to damages for buyer's failure to continue payments on the non-compete provision of the agreement. However, we remand for a determination of the annual average billings to include any subcontracts awarded by Engelhardt to any other firm(s) controlled by buyer as such subcontracts would clearly benefit buyer financially. In all other respects the judgment of the trial court is affirmed.

¶ 51 In the appeal at 2021 WDA 2002, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion. Jurisdiction is relinquished.

¶ 52 In the appeal at 2015 WDA 2002, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion. Jurisdiction is relinquished.