**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4449
_____

JOSEPH FIGUEROA,


v.

PRECISION SURGICAL, INC.,
                                    Appellant.

v.

JOSEPH FIGUEROA D/B/A FIGUEROA MEDICAL-PUERTO RICO;
FIGUEROA MEDICAL & ASSOCIATES, LLC
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 02-10-cv-05575)
District Judge: Honorable Peter G. Sheridan
_____

Submitted Under Third Circuit LAR 34.1(a)
March 11, 2011

Before:   SCIRICA, AMBRO and VANASKIE, *Circuit Judges*

(Filed: April 12, 2011)
_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge*.

Appellant Precision Surgical, Inc. ("Precision") appeals a decision by the District Court denying its motion to preliminarily enjoin a former sales representative, Appellee Joseph Figueroa, from working for a competitor. Because we find that the District Court did not abuse its discretion in denying the motion for a preliminary injunction, we will affirm.

I.

As we write only for the parties, who are familiar with the facts and procedural history of the case, we will set forth only those facts necessary to our analysis. Precision is a distributor of surgical supplies and equipment, actively marketing in New York, New Jersey, Delaware, and Pennsylvania, with a customer base throughout the United States and abroad. It represents on an exclusive basis six manufacturers of surgical equipment and supplies, and also represents approximately 50 manufacturers on a non-exclusive basis.

In October, 2003, Precision employed Joseph Figueroa ("Figueroa") as an independent sales representative. On April 23, 2004, Precision and Figueroa entered into a written Independent Contractor Agreement ("ICA"). The ICA contained a number of restrictive covenants, including a non-solicitation covenant, a non-competition covenant, and a confidentiality covenant, all of which extended for a 24-month period beyond the termination of the ICA.

During the course of his relationship with Precision, Figueroa worked from his home while also maintaining an office at Precision. His official Job Description called

2

Figueroa an "account executive." It mandated that "[a]proximately, eighty percent, 80%, of representative[']s time … be spent selling primary exclusive manufacturer product line . . . . [and] [a]pproximately twenty percent, 20%, of representative's time to be spent selling non-exclusive 'support' products offered by Precision…." (J.A. 475.) Numerous other restrictions were also placed on Figueroa's work performance, including daily reporting, attending monthly or semi-monthly meetings, reporting absences, posting his schedule on a corporate electronic calendar, instructions on how to dress, orders to receive immunizations, and obtaining permission to give quotes to companies outside his territory. In 2008, at Precision's direction, Figueroa created a limited liability company, Figueroa Medical & Associates, LLC, to which Precision began making Figueroa's commission payments.

It appears from the record that numerous problems developed between Figueroa, who wanted to be an independent contractor free from what he regarded as Precision's micromanagement of his performance, and Precision, who felt that the restrictions on Figueroa were consistent with the ICA. Tensions reached a boiling point when Figueroa claimed that his accountant discovered that Precision had made deductions from Figueroa's commissions. On September 23, 2010, Figueroa met with John Kalman, Precision's president, and asked Kalman to enter into a new independent contractor agreement with him. Precision, however, had determined that it desired to "move people towards an employee relationship" and abolish its independent contractor positions. Accordingly, it countered by proposing to convert Figueroa to employee status. Figueroa refused, and Precision terminated the ICA.

3

Figueroa then brought a civil action against Precision in the Superior Court of New Jersey, Bergen County, alleging that the restrictive covenants in the ICA were unenforceable. The case was removed to the District Court for the District of New Jersey. Precision filed a counterclaim against Figueroa as well as a third-party complaint against Figueroa's companies, Figueroa Medical & Associates, LLC, and Figueroa Medical-Puerto Rico. In its counterclaim, Precision alleged that Figueroa was acting in violation of the ICA by working as an independent sales representative for R. C. Sales, one of Precision's direct competitors. Precision further alleged that Figueroa's establishment of Figueroa Medical-Puerto Rico, which sought to distribute products in Puerto Rico, violated the ICA because Precision was entitled to a right of first refusal to sales in that region. Precision filed an Emergency Motion for Entry of an Order to Show Cause and Issuance of a Preliminary Injunction, seeking to uphold the ICA's restrictive covenants. Following a hearing, the District Court denied the requested relief. Precision now appeals.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

Although we apply state law to the substantive issues in this diversity action, *see Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), [1] "[w]e utilize a federal standard in examining requests to federal courts for preliminary injunctions." *See Instant Air Freight*

---

[1] The parties agree that Pennsylvania law applies to the substantive issues in this case.

4

*Co. v. C. F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989). There are four factors to consider in assessing a motion for a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by the denial of relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 879 (3d Cir. 1997).

"[W]hen reviewing a decision to grant or deny a preliminary injunction, this court reviews a district court's findings of fact for clear error, conclusions of law *de novo*, and the ultimate decision to grant or deny the preliminary injunction for an abuse of discretion." *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks and citation omitted). Moreover, covenants not to compete are disfavored in Pennsylvania, and their provisions may be equitably enforced "only so far as reasonably necessary for the protection of the employer's protectible [sic] business interests." *Hess v. Gebhard & Co., Inc.*, 808 A.2d 912, 920 (Pa. 2002).

A.

The District Court found that Precision was not entitled to the extraordinary injunctive relief that it sought because it had not demonstrated a substantial likelihood of prevailing on the merits due to its apparent failure to abide by the terms of the ICA.

5

Specifically, the District Court concluded that Precision had likely breached the ICA by treating Figueroa as an employee, as opposed to according him the flexibility to be accorded an independent contractor, the status contemplated by the parties in the ICA. The District Court also found that Precision had likely breached the ICA by failing to pay the commissions to which Figueroa was entitled. We discern no error in the District Court's findings.

First, there was ample evidence presented at the hearing to suggest that Precision had breached the ICA by treating Figueroa as an employee rather than as an independent contractor. Figueroa's title was "Account Executive." Precision established primary and secondary levels of reporting authority, as well as dress requirements, training obligations, and sales goals. (*See* J.A. 238.) Figueroa testified that he "wasn't allowed to" solicit clients independent of Precision's involvement, and that "[i]f I had a relationship or even talked to someone, they were all over me." (J.A. 755.) Figueroa was given what "looks almost like an employment identification picture," a Precision business card, and a Precision headquarters telephone number. He was required to devote 100% of his time to Precision, and he was apparently required to inform Precision of future market opportunities, such as those cultivated in Puerto Rico. (J.A. 831-32.) All of these factors make it look much more likely that Figueroa was treated as an employee in derogation of Precision's agreement in the ICA to retain Figueroa as an independent contractor.[2]

---

[2] Precision responds that restrictive covenants are enforceable as a matter of law, whether they are in the context of an employment agreement or an agreement with an independent

Second, there was sufficient evidence to support a determination that Precision breached the ICA by failing to pay commissions to which Figueroa was entitled. On numerous occasions, Figueroa attempted to use subcontractors for service or maintenance work on equipment sold to hospitals. Precision repeatedly instructed Figueroa to use Northeast Medical for service and maintenance work.[3] Northeast Medical was owned by John Kalman. Figueroa was told that his failure to use Northeast as a subcontractor "is not an acceptable response to our service hiring protocol." (J.A. 270.) Figueroa rejoined that he was an independent contractor and would proceed as he saw fit. (J.A. 546-47.) When Figueroa invoiced Precision for payments connected with subcontractor maintenance expenses, Precision deducted the amount of the invoices from his commission. (J.A. 759-60.) For this reason, the parties dispute whether Precision has paid Figueroa in full. Precision claims that it has; Figueroa claims that he should be compensated for the amount of the deductions as well.[4]

---

contractor. While true in the abstract, the manner in which Precision treated Figueroa is relevant to the issue of whether its breaches of the parties' contract militates against preliminary injunctive relief.

[3]In fact, Kalman indicated that "[t]here was a policy written that we wanted that done." (J.A. 727.) This policy appears to be a directive from Robert F. Sariego, Vice President of Sales & Project Management, dated September 11, 2009. (J.A. 304.)

[4] We agree with Precision's contention that, pursuant to its previous agreement with Figueroa, it is not responsible for paying commissions on sales made by Figueroa for which Precision has not received payment. Such "accelerated" payments are not supported by the agreement or by past practice, as Figueroa acknowledges by acknowledging that they are "new rules," and Figueroa can hardly complain that a failure to pay them renders the agreement unenforceable. (*See* J.A. 627.)

7

"The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P. C. Yonkers v. Celebrations of the Party and Seasonal Superstore*, 428 F.3d 504, 508 (3d Cir. 2005). It is, of course, a well-settled principle of contract law that "a material breach by one party to a contract entitles the non-breaching party to suspend performance." *Widmer Engineering, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003). In the context of a motion for a preliminary injunction seeking to enforce a restrictive covenant, an apparent material breach of contract by the employer undermines its claim to such extraordinary relief. The District Court found that the evidence indicated that Precision did not perform as required by the ICA, observing that Precision "has not shown that it has consistently paid Mr. Figueroa all the compensation due him under his contract." (J.A. 830.) The District Court's findings are not clearly erroneous, and provide a rational basis for denying preliminary injunctive relief.

There appears to be another basis for denying preliminary injunctive relief not addressed by the District Court, and that is whether the restrictive covenants at issue here were supported by adequate consideration.[5] Under Pennsylvania law, a restrictive covenant imposed subsequent to the establishment of an employment or independent contractor relationship "must be supported by new consideration." *Gagliardi Bros., Inc. v. Caputo*, 538 F. Supp. 525, 528 (E.D. Pa. 1982) (quoting *George W. Kistler, Inc. v. O'Brien*, 347 A.2d 311, 316 (Pa. 1975)). In *Caputo*, an employer sought to enforce a

---

[5] We, of course, may affirm the District Court's ruling on any ground supported by the record. *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

8

covenant not to compete which was contained in a contract executed two years after the employment relationship was formed. *Id.* at 526. Although the employee was given a raise at about the time of the contract's execution, the raise was found to be a routine salary increase. *Id.* Accordingly, the court found that there was insufficient consideration to support the restrictive covenants.

The situation here appears similar. By letter dated October 23, 2003, Figueroa was offered a "subcontractor position" with Precision as an "Executive Account Manager." According to this letter, Figueroa's compensation was initially set at $8,000 per month, from November 1, 2003, through April 30, 2004. From May 15, 2004, through October 15, 2004, he would be put "on a conventional draw against commissions," and on September 30, 2004, Figueroa was to be evaluated for the purpose of determining whether his commissions exceed the amount drawn on his account; if so, he would be compensated for the extra amount. His commission rate was set in October, 2003, at 50% of net profits less a 10% administrative fee, for amounts $500,000 or less. For amounts from $500,001 and above, he was to receive 55% of net profits less a 10% administrative fee. Figueroa commenced working for Precision in October of 2003.

Figueroa signed the ICA on April 23, 2004, nearly six months after the parties' contractual relationship was formed. The ICA is silent about compensation, providing only that Figueroa "shall be paid in the form of commissions pursuant to a calculation mutually agreed upon by the parties." (J.A. 252.) Significantly, Kalman, Precision's president, admitted at the preliminary injunction hearing that there was no alteration of compensation between October 2003 and December of 2004. (J.A. 702.) He further

9

stated that "[t]he intent [behind the ICA] was to have an agreement," and that his "intent was not to give [Figueroa] any more benefits or anything additional to what he was getting before the agreement." (J.A. 711.) In light of the evidence, there is a substantial issue as to whether there was adequate consideration for the restrictive covenants, thus warranting denial of preliminary injunctive relief.

In summary, the record discloses ample reasons for concluding that Precision had not demonstrated a reasonable probability of succeeding on the merits. Accordingly, the District Court did not abuse its discretion in denying Precision's motion for a preliminary injunction.

B.

Even if Precision had demonstrated a likelihood of prevailing on the merits, preliminary injunctive relief was foreclosed by the District Court's finding that Precision did not demonstrate irreparable injury. In the context of the grant of a preliminary injunction in this Circuit, irreparable injury has been defined as "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C. F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Indeed, such loss must not be merely economic, but "of a peculiar nature, so that compensation in money cannot atone for it." *A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976) (internal quotation marks omitted). No less than a "clear showing of immediate irreparable injury" is required. *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir. 1976).

When asked to discuss the harm Precision sustained as a result of Figueroa's conduct, John Kalman, the President of Precision, opined that he had received letters

10

"terminating the . . . exclusive territory that we had with Dornoch Medical Systems," (J.A. 655), and that "Lista International has also reduced our territory," although he could not state with certainty that Figueroa was handling sales for either supplier. (J.A. 658). Kalman also testified that a purchase order of $36,000 had been cancelled by the Maimonides Medical Center, (J.A. 660), and that Figueroa had attempted, apparently unsuccessfully, to solicit business from another Precision customer, Englewood Surgical Center. (J.A. 664.) Although Kalman testified that he believed that Figueroa was diverting business to Precision's competitor, R.C. Sales, he conceded that, even if the injunction were granted, direct competition with R.C. Sales would continue. (J.A. 687.) The District Court concluded that "[t]here's nothing in the proofs before me today that shows that Precision could not remedy the situation through monetary damages." (J.A. 833.)

We have previously held that even when an action will result in the destruction of a business, a District Court was still justified in refusing to grant a preliminary injunction when the loss was "capable of ascertainment and award at final judgment if [petitioner] prevails." *Instant Air Freight Co. v. C. F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Precision's evidence focused on its projected loss of income and the diversion of its business interests, indicating that any injury was compensable through a monetary damages award. Precision failed to meet the high standard required for the granting of a preliminary injunction to enforce a covenant not to compete. For this reason as well, the District Court did not abuse its discretion when it denied Precision's request for a preliminary injunction.

11

## III.

For the foregoing reasons, we will affirm the judgment of the District Court.