2015 PA Super 227

| | |
|---|---|
| BURLINGTON COAT FACTORY OF PENNSYLVANIA, LLC AND BURLINGTON COAT FACTORY WAREHOUSE CORPORATION | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| GRACE CONSTRUCTION MANAGEMENT COMPANY, LLC | |
| Appellee | No. 2036 EDA 2013 |

Appeal from the Order Dated June 14, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No: 2011 No. 001844

BEFORE:  BOWES, J., DONOHUE, J., SHOGAN, J., LAZARUS, J., MUNDY, J., OLSON, J., WECHT, J., STABILE, J., and JENKINS, J.

OPINION BY STABILE, J.:                    **FILED OCTOBER 29, 2015**

Appellants, Burlington Coat Factory of Pennsylvania, LLC ("BCF of PA") and Burlington Coat Factory Warehouse Corporation ("BCFW" and, collectively with BCF of PA, Appellants), appeal from the June 14, 2013 order granting the summary judgment motion of Grace Construction Management Company ("Grace").  We vacate and remand.

In this case, we must decide whether and to what extent Grace undertook and breached a contractual obligation to defend and indemnify Appellants in a negligence action filed by an employee of Grace's sub-subcontractor for injuries the employee sustained during renovations of

Appellants' retail store. On August 28, 2009, Grace entered into a contract (the "Contract") to perform substantial renovations to one of Appellants' retail stores (the "Store") in Philadelphia. The Contract identified the parties as "Grace Construction Management Company, LLC" and "Burlington Coat Factory (BCF)." Contract, at cover page.[1] "Burlington Coat Factory" is a trade name Appellants use for their retail stores, but it is not the name of a legal entity. Appellants' Opposition to Grace's Motion for Summary Judgment, at Exhibit L. Appellants do not dispute that they drafted the Contract.

Pursuant to the Contract, Grace had a duty to supervise all portions of the performance of the Contract:

> The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work.

Contract, General Conditions, at Heading III, ¶ 3.a.

The Contract also contains two indemnifications provisions, both of which are relevant to this appeal. The first--contained within the General Conditions to the Contract--provides:

> To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless BCF […] from and against all claims, damages, losses and expenses, including but not limited

---

[1] The Contract is organized in outline form and not paginated. Throughout the Contract, Burlington Coat Factory is referred to as BCF.

to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting there from, **but only to the extent caused in whole or in part by negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable,** regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

*Id.* at Heading III, ¶ 12 (emphasis added).

The second, Exhibit A to the Contract, is both similar and different from that quoted above and provides:

Grace Construction Management Company releases BCF and assumes entire responsibility and liability for any and all claims and/or damages of any nature or character whatsoever arising under the Contract Documents, by operation of law, or in any other manner with respect to work covered by this CONTRACT **and agrees to indemnify and save BCF harmless from and against all claims**, demands, liabilities, interest, loss, damage, attorneys' fees, costs and expenses of whatsoever kind or nature, whether **for property damage, personal injury, or bodily injury (including death) to any and all persons, whether employees of, Grace Construction Management Company, BCF or others,** or otherwise, caused or occasioned thereby, resulting therefrom, or occurring in connection therewith.

*Id.* at Exhibit A, ¶ 1 (emphasis added). Significantly, the indemnity provision contained within the General Conditions limits Grace's obligations to claims arising out of its negligence or that of its subcontractors. The indemnity obligation under Exhibit A to the Contract does not have a similar limitation.

Paragraph 2 of Exhibit A imposes upon Grace the obligation to procure and maintain insurance (including workers' compensation, general liability and automobile liability) and to "Name BCF and Landlord as additional Insured[.]" *Id.* at Exhibit A, ¶ 2. Paragraph 2(D) to Exhibit A addresses general liability coverage and provides:

> The General Liability coverage shall include BCF as an Additional Insured and include the "Aggregate Limits per Project" endorsement. This $2,000,000 general Aggregate limit shall by endorsement apply to each project of the Grace Construction Management Company and the $2,000,000 aggregate endorsement shall be fully available under this CONTRACT with Contractors and shall not be depleted by claims arising from any other project, work, job, sale or delivery. **The General Liability coverage shall include contractual liability coverage for the liability that Grace Construction Management Company assumes and/or undertakes (for example, indemnification obligations), under this CONTRACT. [...].** Before commencing work, and before delivering any materials, articles and/or equipment hereunder, Grace Construction Management Company shall furnish a properly completed Accord Evidence of Insurance addressed to BCF establishing that all the insurance coverage required hereunder is in force and will not be canceled with less than thirty (30) days prior written notice to BCF, such notice to be by Certified Mail. The certificates will list BCF as an additional named insured. […] Failure of BCF to require the production of such certificates of insurance shall not absolve CONTRACTOR of its obligations in respect thereto. […] No payment shall be made on this CONTRACT agreement prior to receipt of certificate of insurance acceptable to BCF.

*Id.* at Exhibit A, ¶ 2(D) (emphasis added).

On October 1, 2009, Bryan Eddis ("Eddis"), an employee of Belfi Brothers, one of Grace's sub-subcontractors, sustained injures when the gate of a freight elevator (the "Elevator") closed on him. Eddis filed suit (the

- 4 -

"Eddis Action") against Appellants and Schindler Elevator Corporation ("Schindler"), but not against Grace. The accident happened while Eddis was using a wheelbarrow to move building materials from a loading dock to the Elevator. Appellants' Motion for Summary Judgment, 1/15/13, at Exhibit B, ¶ 6.[2] "As [Eddis] was preparing to set the wheel barrel [sic] down on the floor of the [Elevator], suddenly and without warning, the elevator doors closed on [Eddis] striking him on his back and pinning him between the closing doors and the wheel barrel [sic]." *Id.* Eddis alleged his injuries resulted from negligent construction, maintenance and repair of the Elevator. *Id.* at ¶¶ 14-16. In 2012, Eddis received a $70,000.00 settlement from Schindler and Appellants, with Appellants contributing $35,000.00 to the settlement. Appellants settled without admitting liability.

On November 3, 2011, Appellants' third-party administrator tendered Eddis' damage claim to Grace. *Id.* at ¶ 20 and Exhibit C. On June 15, 2011, Appellants tendered their defense in the Eddis Action to Grace. *Id.* at ¶ 22 and Exhibit D. On September 12, 2011, Grace's insurer declined the tender, reasoning that Eddis alleged negligence against Appellants but not against Grace. *Id.* at ¶ 23 and Exhibit E. Grace's insurer also reasoned that the accident with the Elevator was not related to Grace's work under the

---

[2] Exhibit B of Appellants' summary judgment motion is a copy of Eddis' complaint.

Contract, as Grace's renovations of the Store did not include renovations of the Elevator. *Id.*

In October of 2011, Appellants commenced this breach of contract action against Grace. The complaint alleged a single claim of breach of contract based on multiple acts. According to the complaint, BCFW and Grace were the parties to the Contract. Complaint, 10/14/11, at ¶ 11. BCF of PA was a third-party beneficiary of the Contract. *Id.* at ¶ 12. Appellants alleged the Contract obligated Grace "to provide and supervise appropriately trained labor for the renovations," and that Eddis was under Grace's supervision and control pursuant to the Contract. *Id.* at ¶¶ 13-14. Appellants therefore alleged that Grace breached its contractual obligation to "train and/or properly train its subcontractors, their subcontractors, and their employees regarding use of the freight elevators within the Store, thereby causing the incident that gave rise to the Eddis Action." *Id.* at ¶ 25(e). Likewise, Appellants averred Grace breached its contractual obligation to "supervise and/or properly supervise its subcontractors, their subcontractors, and their employees regarding use of the freight elevators within the Store, thereby causing the incident that gave rise to the Eddis Action[.]" *Id.* at ¶ 25(f). Finally, Appellants alleged that Grace breached its obligation to defend and indemnify them in the Eddis Action, and that Grace also breached its obligation to "ensure that BCFW and BCF of PA were added as Additional Named Insureds on its policy of insurance." *Id.* at ¶ 25(a),

(b), and (d). According to the complaint, the Contract obligated Grace to "ensure that its insurance coverage was primary as to BCFW." **Id.** at ¶ 17.

Appellants filed a summary judgment motion on January 15, 2013 seeking judgment in their favor on their breach of contract claim. Grace filed a cross motion for summary judgment on January 18, 2013, asserting (1) that Appellants were not parties to the Contract; (2) maintenance of the Elevator was outside the scope of Grace's obligations under the Contract; (3) Appellants' voluntary settlement of the Eddis Action precluded a claim for indemnity from Grace; and (4) the Contract did not obligate Grace to indemnify Appellants for their own negligence.[3]

On June 14, 2013, the trial court denied Appellants' motion for summary judgment and granted summary judgment in favor of Grace. The trial court found that the record evinced Appellants' negligence in failing to maintain the Elevator. The trial court found no evidentiary support, and thus no triable issue of fact, for Appellants' allegations of Grace's negligence. In particular, the trial court found no evidence that any negligence on Grace's part was a proximate cause of Eddis' injury. Trial Court Opinion, 6/14/13, at 6. The trial court also found that Grace did not agree to indemnify Appellants for their own negligence. **Id.** Finally, the trial court found that Grace discharged its contractual obligation to insure Appellants

---

[3] On February 13 and 21, 2013, the parties filed responses, pursuant to Rule 1035.3, to the competing summary judgment motions.

because "there is nothing in the Contract that requires that [Grace's] insurance be primary." *Id.* at 4. In light of these rulings, the trial court did not address Grace's arguments regarding Appellants' voluntary settlement or Appellants' status as parties to the Contract. This timely appeal followed.

Appellants present questions for review as follows:

1. Did the lower court err in granting summary judgment in favor of [Grace], a construction manager, on a finding that only Burlington Coat Factory ("Burlington"), a building owner, could be liable for an injury to a construction worker that occurred in Burlington's freight elevator when there was evidence from which a jury could find that:

   a. The elevator did not malfunction; or

   b. The injury was caused, in whole or in part, by the negligence of [Grace] or persons for whose negligent acts [Grace] undertook to indemnify Burlington, including the injured workman?

2. Did the lower court err in granting summary judgment to the construction manager on a conclusion of law that the construction contract did not require the construction manager to indemnify the store owner for its negligence when a general indemnification provision in the General Conditions of the contract benefitting numerous parties limited the indemnification duty to 'the extent caused by' negligence of the construction manager or anyone working under it, but a more specific provision in the contract, relating only to the store owner, provided for an unlimited duty of indemnity?

3. Did the lower court err in granting summary judgment to the construction manager upon a conclusion of law the manager satisfied its obligation to procure insurance naming the store owner as an additional insured, when the insurance procured was not primary, and, accordingly, the parties' intentions to allocate the burden of buying insurance for a construction project was defeated?

Appellant's Original Brief, at 2-3. Appellants' Substituted Brief for

Reargument *En Banc*, at 4.[4] We consider these arguments in turn.

We begin with our standard of review:

> [S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Pa.R.C.P. No. 1035.2(1).[5] When

---

[4] Appellants' substituted brief refers this Court to its prior brief for questions it does not address in its substituted brief. Appellants' Substituted Brief for Reargument *En Banc*, at 3, n.1. Specifically, questions two and three, quoted above, appear only in Appellants' original brief. Question one appears in both briefs with slight alterations in the phrasing. We have quoted question one as it appears in the substituted brief.

[5] Rule 1035.2 provides as follows:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.
>
> *Note:* Rule 1035.2 sets forth the general principle that a motion for summary judgment is based on an evidentiary record which entitles the moving party to judgment as a matter of law.
>
> The evidentiary record may be one of two types. Under subparagraph (1), the record shows that the material facts are undisputed and, therefore, there is no issue to be submitted to a jury.

*(Footnote Continued Next Page)*

considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo.* This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a

*(Footnote Continued)* ———————————

An example of a motion under subparagraph (1) is a motion supported by a record containing an admission. By virtue of the admission, no issue of fact could be established by further discovery or expert report.

Under subparagraph (2), the record contains insufficient evidence of facts to make out a prima facie cause of action or defense and, therefore, there is no issue to be submitted to a jury. The motion in this instance is made by a party who does not have the burden of proof at trial and who does not have access to the evidence to make a record which affirmatively supports the motion. To defeat this motion, the adverse party must come forth with evidence showing the existence of the facts essential to the cause of action or defense.

Oral testimony alone, either through testimonial affidavits or depositions, of the moving party or the moving party's witnesses, even if uncontradicted, is generally insufficient to establish the absence of a genuine issue of material fact. ***See Nanty-Glo v. American Surety Co.,*** 163 A. 523 (1932); ***Penn Center House, Inc. v. Hoffman***, 553 A.2d 900 (1989).

Only the pleadings between the parties to the motion for summary judgment must be closed prior to filing the motion.

Pa.R.C.P. No. 1035.2.

question of law, we shall review the grant of summary judgment in the context of the entire record.

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010) (quotation marks and case citations omitted). "[A] non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." *Ertel v. Patriot-News Co.*, 674 A.2d 1038, 1042 (Pa. 1996), *cert. denied*, 519 U.S. 1008 (1996). "Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*

Appellants first argue the trial court erred in finding no triable issue of fact as to the negligence of Grace and/or any entity or person for whom Grace assumed responsibility under the Contract. In their complaint, Appellants alleged that Grace breached its contractual duty to indemnify Appellants for Grace's negligence and/or the negligence of Belfi and Eddis.

> Three elements are necessary to plead properly a cause of action for breach of contract: [(1)] the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. Additionally, it is axiomatic that a contract may be manifest orally, in writing, or as an inference from the acts and conduct of the parties.

*J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002). At issue here are elements two and three.

As noted above, Grace agreed to supervise its own employees and those of its subcontractors in the performance of the work. Contract, at

Heading III, ¶ 3.a. In addition, Grace agreed to indemnify Appellants against claims "caused in whole or in part by negligent acts or omissions of the Contractor, **a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable** [….]" *Id.* at Heading III, ¶ 12.[6]

Eddis was an employee of Belfi Brothers, one of the sub-subcontractors working on Store renovations pursuant to the Contract. Eddis sustained his injury while in the process of moving a wheelbarrow filled with tile from a loading dock onto the Elevator. Appellants produced evidence that construction workers were required to have supervision while using the Elevator. Arthur C. Snellbaker, Jr. ("Snellbaker") was the on-site supervisor for Grace. Appellants' Motion for Summary Judgment, 1/15/13, at Exhibit F, pp. 19, 24.[7] One of Appellants' employees instructed Snellbaker how to use Appellants' freight elevators, including the Elevator. *Id.* at 48. According to Snellbaker, "Burlington Coat had requested that we grab either an assistant manager or the security guard to operate the freight elevators for us." *Id.* at 49. Snellbaker informed the subcontractors'

---

[6] This contractual indemnity obligation, to the extent quoted, is not inconsistent with the scope of the contractual indemnity obligation found under Exhibit A to the Contract as quoted *supra.*

[7] Exhibit F is the transcript of Snellbaker's September 19, 2012 deposition in connection with the Eddis Action. The cited page numbers correspond to the transcript pages.

foremen of that request. *Id.* Appellants wanted a manager or security guard present to prevent theft, as the freight elevator led to and from the loading dock, from where anybody could enter or exit Appellants' premises. *Id.* Nonetheless, Snellbaker observed subcontractors' workers using the freight elevator without assistance. *Id.* at 57. When that occurred, Snellbaker yelled at them. *Id.* at 58.

Kevin Cromwell ("Cromwell") worked in loss prevention for Appellants. Grace's Motion for Summary Judgment, 1/18/13, at Exhibit Q, p. 7.[8] His job was to be present as a loss prevention agent during remodeling of the Store. *Id.* at 9. He rode the Elevator with Eddis on several occasions. *Id.* at 18. Cromwell also showed Eddis how to use the Elevator properly, including how to use the "run/stop" switch. *Id.* at 19-20. Cromwell explained the need to stand clear of the doors when the switch is set to "run." *Id.* at 26. Eddis told Cromwell he understood. *Id.* at 27. Cromwell did not recall a supervisor directing him to give instructions on proper use of the Elevator. *Id.* at 29. He did so on his own. *Id.* Cromwell was not aware of whether and to what extent his employer was responsible for conducting periodic safety inspections of the Elevator. *Id.* at 54.

Cromwell observed surveillance footage of Eddis' accident:

---

[8] Exhibit Q to Grace's motion is Cromwell's May 24, 2012 deposition in connection with the Eddis Action. The cited page numbers correspond to the transcript pages.

I observed Mr. Eddis in the process of getting onto the [Elevator] from the loading dock area in a wheelbarrow. He was getting on and pulled out and he got back on a second time and the inner door came down. The inner door struck him on his mid back and the door went back up.

*Id.* at 59. Cromwell stated the run/stop switch "would have to be in run mode" at the time. *Id.* Due to a brown out, Cromwell was unable to preserve that footage. *Id.* at 58-59, 73. When Cromwell spoke with Eddis after the accident, Cromwell observed a six-inch by two-inch red mark on Eddis' back. *Id.* at 61. Eddis told Cromwell he was "fine" and completed the remainder of his work shift. *Id.* at 88. Cromwell tested the Elevator immediately after the accident and found it to be functioning properly. *Id.* at 78-79.

Eddis testified in his deposition that when he asked for a freight elevator operator, none was available. Appellants' Motion for Summary Judgment, 1/15/13, at Exhibit H, p. 118. Specifically, Eddis asked a fellow Belfi Brothers employee for a freight elevator operator, but was laughed at. *Id.* at 118-19.[9]

---

[9] Exhibit H is the transcript of Eddis' March 8, 2012 deposition in connection with the Eddis Action. The cited page numbers correspond to the transcript pages. We note that Exhibit H contains only selected pages of the transcript. Appellants' Brief refers to pages other than those included in Exhibit H. Appellants reference pages 42, 52 through 55, and 243 of the transcript in their brief. Appellants' Substituted Brief for Reargument *En Banc*, at 24-25. Exhibit H skips from page 40 to 118 and concludes with page 119. We cannot consider any evidence that has not been incorporated into the certified record. *See Brandon v. Ryder Truck Rental, Inc.*, 34

*(Footnote Continued Next Page)*

Grace attached to its summary judgment motion an expert witness report from an engineer, J. Pablo Ross ("Ross"). Grace's Motion for Summary Judgment, 1/18/13, at Exhibit R. The Ross report notes that in July of 2009, Schindler sent an upgrade order to Appellants proposing $157,384.00 in upgrades to the Elevator. *Id.* at 8.[10] The July proposal was Schindler's third upgrade proposal since 2003. *Id.* at 7-8. Schindler noted "make-shift" repairs had been made to the Elevator and that "long-term safe and reliable repairs" were no longer possible. *Id.* at 8. Schindler recommended installation of a new gate. *Id.* at 8.

The Ross report notes several occasions throughout 2009 on which the Elevator malfunctioned in some way. The Elevator gate was stuck on May 14, 2009. *Id.* On May 22, 2009, the Elevator was "opening and closing on its own." *Id.* On May 23, 2009 the Elevator "became stuck on the loading dock level with the doors cycling." *Id.* at 9. On May 25 and July 23, 2009, the Elevator was "not working." *Id.* The Elevator was reported "out of service" on September 17, 2009. *Id.* A post-accident investigation of the Elevator on November 4 and 5, 2009 revealed that the Elevator's alarm bell failed to sound before the gate closed. *Id.* at 10. The Ross Report

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

A.3d 104, 106 n.1 (Pa. Super. 2011) ("Any document which is not part of the official certified record is considered to be nonexistent[.]").

[10] The page numbers refer to the internal pagination of Ross' August 21, 2012 written expert report prepared in connection with the Eddis Action.

concludes that the alarm bell was not operational at the time of Eddis' accident. *Id.* at 11-12. The Ross report also concludes that either a "safety shoe" failed or the Elevator gate derailed from its track, causing the gate not to retract after it closed on Eddis. *Id.* at 13. The gate had derailed from its track on several occasions prior to the accident. *Id.*

To summarize the foregoing, Snellbaker's testimony confirms that Appellants instructed Grace not to permit workers to use the freight elevators unsupervised. Both Snellbaker and Cromwell—a loss prevention officer—testified that the supervised use of the freight elevators was meant to prevent theft. In this regard, Appellants' argument in their brief that "[i]t is undisputed that Burlington requested that Grace adopt **a safety precaution** relating to the use of the freight elevator by Grace's supervisees, including Eddis, and Grace agreed to adopt that precaution" and that "[a] workman getting hit by a closing door is precisely the kind of accident that the **disregarded safety rule** was intended to avoid" is not accurate. Appellants' Substituted Brief for Reargument *En Banc,* at 21, 37 (emphasis added). The record does not support a conclusion that supervised elevator use was a safety precaution rather than a loss prevention measure. Cromwell instructed workers, including Eddis, on how to use the Elevator, but apparently did so without any directive from Appellants.

Nonetheless, Cromwell's testimony could support a finding that Eddis was negligent in his use of the Elevator by moving in and out of the car—and underneath the gate—while the Elevator was in run mode rather than stop mode. As noted above, Grace agreed to indemnify Appellants in the event of negligence on the part of Grace, its subcontractors and their employees. Contract, at Heading III, ¶ 12. Furthermore, supervised use of the Elevator could have prevented the accident even if the supervision was for a purpose other than employee safety. The record contains evidence from which a factfinder could determine that Grace undertook and breached a duty to supervise construction workers' use of the Elevator.

On the other hand, Grace has produced the Ross report, in which Ross documents Appellants' repeated failure to maintain and repair the Elevator, and repeated breakdowns and failures of the Elevator in the months leading up to the Eddis accident. Based on the Ross report and what it deemed "scant" evidence of Grace's negligence, the trial court found that Appellants produced insufficient evidence to establish that any breach of duty on Grace's part was the cause of Eddis' accident. Trial Court Opinion, 6/14/13, at 5 ("In this case, there is no evidence, expert or otherwise, that Mr. Eddis' or Grace's failure to request assistance, rather than an alleged malfunction of the elevator, was the cause of his injuries."). Thus, Grace asserts that its negligence, if any, cannot be the legal cause of the Eddis accident.

On the record before us, we believe reasonable minds can differ as to the cause of the Eddis accident. The record contains evidence that Appellants were less than diligent in maintaining the Elevator, and that the Elevator malfunctioned on occasion, but it is not clear whether the Elevator malfunctioned on the day in question. The record also contains evidence that Grace was derelict in its obligation to require supervised use of the Elevator. While that obligation was imposed to prevent theft rather than ensure worker safety, a factfinder could determine that Grace's conduct was wholly or partially the cause of the Eddis accident. Finally, the record contains evidence that Eddis' own negligence was partially or entirely the cause of the accident. It is equally plausible Eddis failed to switch the Elevator from run mode to stop mode, and failed to stand clear of the gate while the Elevator was in run mode, as Cromwell instructed him to do. For all of these reasons, we believe this case presents a triable issue of fact as to causation.

Contrary to Grace's argument, Appellants' failure to present expert testimony does not require a different conclusion. Expert testimony is necessary when a case presents questions beyond the ken of the average layperson. **Vazquez v. CHS Professional Practice, P.C.**, 39 A.3d 395, 398-99 (Pa. Super. 2012). Grace argues that expert testimony is necessary here because a jury will otherwise be unable to determine causation in this case. Grace fails to consider that the nature of the negligence alleged by

Appellants is distinguishable from the nature of the elevator malfunction for which Grace provided an expert report. Two potential sources of causation at issue here—Grace's alleged failure to procure supervision for Eddis and Eddis' own negligence—are well within the ken of the average layperson and do not require expert testimony. Jurors do not need expert testimony to assess whether the absence of a supervisor caused the accident. Nor do they need expert testimony to assess whether Eddis was negligent by, for example, failing to use the run/stop switch to stop the Elevator.

Grace cites **MIIX Insurance Co. v. Epstein**, 937 A.2d 469 (Pa. Super. 2009), a medical malpractice case in which this Court held summary judgment was appropriate because the plaintiffs failed to produce expert reports in support of their claims. We do not find the instant case analogous to professional negligence cases. The alleged acts of negligence asserted by Appellants do not concern professional malpractice, which by necessity requires expert testimony. **MIIX**, therefore, is inapplicable to consideration of Appellants' proffered evidence of Grace's and/or Eddis' alleged negligence. Accordingly, the absence of an expert report from Appellants does not warrant summary judgment in Grace's favor on the issue of causation.[11]

_____

[11] Regarding the third potential cause of the accident—the Elevator's malfunction—the record contains an expert opinion secured by Grace. The parties do not challenge the necessity of an expert report on this issue and we do not here express any opinion on whether an expert report is necessary in all cases of alleged elevator malfunction.

In summary, we conclude the trial court erred in granting summary judgment in Grace's favor on the issue of Grace's negligence. The Contract plainly requires Grace to indemnify Appellants[12] in the event of Grace's negligence or that of its subcontractors. We conclude that the record, read in a light most favorable to Appellants as the non-moving parties, presents a triable issue of fact on the issue of Grace's and/or Eddis' negligence.

The parties next dispute whether the trial court erred in finding that the Contract does **not** require Grace to indemnify Appellants for Appellants' own negligence. The Contract contains two conflicting indemnity clauses, both of which are quoted above. For the following reasons, we conclude that the more restrictive provision applies and that Grace does not have the obligation to indemnify Appellants for Appellants' own negligence.

An agreement to indemnify is "an obligation resting upon one person to make good a loss which another has incurred or may incur by acting at the request of the former, or for the former's benefit." ***Potts v. Dow Chemical Co.***, 415 A.2d 1220, 1221 (Pa. Super. 1980). "Indemnity agreements are to be narrowly interpreted in light of the parties' intentions as evidenced by the entire contract." ***Consolidated Rail Corp. v. Delaware River Port. Auth.***, 880 A.2d 628, 632 (Pa. Super. 2005), *appeal denied*, 898 A.2d 1071 (Pa. 2006). "In interpreting the scope of an

---

[12] We address Grace's argument that Appellants are not parties to the Contract, ***infra***.

- 20 -

indemnity clause, the court must consider the four corners of the document and its surrounding circumstances." **Widmer Engineering v. Dufalla**, 837 A.2d 459, 472 (Pa. Super. 2003), *appeal denied*, 837 A.2d 459 (Pa. 2004). To establish the right to indemnification, the indemnitee must establish:

> the scope of the indemnification agreement; the nature of the underlying claim; its coverage by the indemnification agreement; the reasonableness of the alleged expenses; and, where the underlying action is settled rather than resolved by payment of a judgment, the validity of the underlying claim and the reasonableness of the settlement.

**McClure v. Deerland Corp.**, 585 A.2d 19, 22 (Pa. Super. 1991).

A party cannot obtain indemnification for its own negligence unless the contract clearly and unequivocally provides for such indemnification. **Ruzzi v. Butler Petroleum Co.**, 588 A.2d 1, 7 (Pa. 1991); **Perry v. Payne**, 66 A. 553, 557 (Pa. 1907). "Unless the language of the contract is clear and unambiguous, however, such that the 'contract puts it beyond doubt' […] we must opt for the interpretation that does not shoulder [the indemnitor] with the fiscal responsibility for [the indemnitee's] negligence." **Greer v. City of Philadelphia, et al.**, 795 A.2d 376, 380 (Pa. 2002) (citing **Perry**, 66 A. at 557; **Ruzzi**, 588 A.2d at 4). Where an agreement includes multiple contradictory indemnity provisions drafted by the same person, we construe the agreement against the drafter and enforce the narrower provision. **Chester Upland School Dist. v. Edward Melony, Inc.**, 901 A.2d 1055, 1061-62 (Pa. Super. 2006).

As set forth above, the narrower indemnity provision included in the General Conditions at Heading III, ¶ 12 does not obligate Grace to indemnify Appellants for their own negligence. Assuming without deciding that the indemnity provision included in Exhibit A creates that obligation, Appellants still cannot prevail. Since Appellants drafted a contract with two conflicting indemnity provisions, we will enforce only the narrower of the two and exclude indemnity for the indemnitee's own negligence. This Court's opinion in **Chester Upland** illustrates the point. There, the indemnitee drafted a contract with two conflicting indemnification clauses, one expressly restricting indemnity to the indemnitor's negligence and another with no such restriction. **Chester Upland**, 901 A.2d at 1059-60. This Court deemed the two indemnification clauses "contradictory and ambiguous" and construed the agreement against the indemnitee as drafter. **Id.** at 1060-61. **Chester Upland** is directly on point and controlling here. The conflict in the Contract's indemnity provisions at issue here must be resolved to exclude indemnity for Appellants' own negligence. As such, Appellants can prevail in this action for contractual indemnification only to the extent the Eddis accident was the result of Grace's negligence and/or that of their subcontractors or their employees, as set forth in the Contract.

We reject Grace's argument that Appellants' voluntary settlement of the Eddis Action bars their claim against Grace for contractual indemnity. Grace cites **Willard v. Interpool, Ltd.**, 758 A.2d 684 (Pa. Super. 2000),

*appeal denied*, 796 A.2d 985 (Pa. 2001), for the proposition that a voluntary settlement bars a claim for contractual indemnity. **Willard** is inapposite, as it involves the law of agency. The **Willard** Court declined to adopt §§ 438 and 439 of the Restatement (Second) of Agency, which permit an agent to settle a lawsuit without admitting liability and recover indemnity from the principal. **Id.** at 687-88. As Appellants and Grace plainly have no principal/agent relationship, the analysis in **Willard** has no application here. Grace does not acknowledge the precise holding in **Willard**, nor does Grace explain how **Willard** would bar recovery in this case. We therefore reject this argument as having no merit. We note that if a contractual indemnitee settles an underlying action, the law does not prohibit recovery. Rather, courts must consider the validity of the underlying claim and the reasonableness of the settlement. **McClure**, 585 A.2d at 22.

Finally, we address Appellants' contention the trial court erred in granting summary judgment on Appellants' claim that Grace breached its obligation to procure insurance. The facts stated previously indicate Appellants required Grace to procure insurance to support the indemnity obligations imposed upon Grace under the Contract. The trial court granted summary judgment in Grace's favor on this claim stating only that "there is nothing in the Contract that requires that Grace's insurance be primary." Trial Court Opinion 6/14/13, at 4. It is not clear how the trial court came to this conclusion given the insurance provision contained within Exhibit A, ¶2

of the Contract and the absence of any provision layering insurance coverage for claims arising out of the work. To the contrary, Exhibit A, ¶2 plainly requires, among other things, general liability insurance for any bodily injury/property damage arising out of or relating to the work and that BCF and the Landlord be named as additional insureds on this coverage. Failure to provide insurance coverage for losses covered under the Contract's applicable indemnity provisions would constitute a breach by Grace under the Contract.[13] Indeed, Grace procured insurance and provided certificates of insurance to Appellants in accordance with the Contract. Grace's insurer, however, denied Appellants' tender because it believed the accident was attributable to the Elevator's malfunction and therefore was not covered. The insurer also denied coverage because Eddis did not allege any negligence on the part of Grace. Based on our analysis above, the cause of the accident—and which party or parties are legally responsible—is an issue for trial. To the extent the trial court held that Grace had no contractual obligation to procure insurance covering Appellant in the event of a claim triggering Grace's indemnity obligation, we find the trial court erred. Of course, it remains to be seen whether the losses claimed by Appellants will fall within the indemnity obligation. Suffice it to say, at this point in the

_____

[13] Any issue as to whether Grace's insurer properly denied coverage is not presently before this Court. We decide only that the trial court erred in determining conclusively at this time that Grace had no contractual obligation to provide insurance coverage for the Eddis Action.

proceedings, it was error for the trial court to grant summary judgment on this claim.

Grace finally argues that Appellants cannot recover on their contract claims because they are not parties to the Contract. Grace contends the plain and unambiguous language of the Contract reveals that the Contract is between Grace and "Burlington Coat Factory," not BCFW. Appellants' Substituted Brief for Reargument *En Banc*, at 23. Grace contends that suit now by BCFW is a post-loss request to reform the Contract. ***Id. a***t 24. In opposition to Grace's summary judgment motion, Appellants produced evidence that "Burlington Coat Factory" is not a distinct legal entity, but a licensed trade name used by the Appellants.[14] Appellants' Memorandum of Law in Opposition to Grace's Motion for Summary Judgment, 2/21/13, at Exhibits K and L. Appellants further produced copies of checks issued by BCFW and accepted by Grace totaling approximately $700,000 for work performed under the Contract. ***Id.***

Appellants' use of "Burlington Coat Factory" as a trade name is considered use of a fictitious name under Pennsylvania's "Fictitious Names Act."[15] ***See*** 54 Pa.C.S.A. § 302 (definitions – a "Fictitious Name" is any

---

[14] Pennsylvania law and our Rules of Civil Procedure contemplate that corporations may enter contracts and/or prosecute litigation under fictitious names. ***See*** 54 Pa.C.S.A. § 331; Pa.R.C.P. 2176 and 2177.

[15] ***See*** 54 Pa.C.S.A. § 301, *et seq.*

assumed or fictitious name, style or designation other than the proper name of the entity using the name). The use of a fictitious name does not create a separate legal entity, but is merely descriptive of a person or corporation who does business under another name. *See Pinkerton's, Inc. v. Superior Court*, 57 Cal.Rptr.2d 356 (1996), citing cases; *see also American Express Travel Related Services Co. v. Berlye*, 414 S.E.2d 499, 501 (1991) ("The use of d/b/a or 'doing business as' to associate a tradename with the corporation using it does not create a legal entity separate from the corporation but is merely descriptive of the corporation"). The business name is a fiction, and so too is any suggestion the business is a legal entity separate from its owner. *Pinkerton*. Appellants' response to Grace's motion for summary judgment reveals that Appellants are in fact "Burlington Coat Factory" and the contracting parties in this case.[16] Grace's contention that Appellants are not the parties to the Contract fails to

_____

[16] Appellants' Exhibits K and L set forth that "BCF" is a registered trade name with the United States Patent and Trademark Office and that "Burlington Coat Factory" is a licensed trade name by BCFW to a family of related entities, including Appellants herein. Appellants' exhibits do not address whether the trade or fictitious name of "Burlington Coat Factory" is registered with the Pennsylvania Department of State. Fictitious names may be registered with the department, *see* 54 Pa.C.S.A. § 311, but the failure to do so does not affect the validity of any contract or act of the entity doing business under a fictitious name. 54 Pa.C.S.A. § 331(a). The failure to register a fictitious name, however, precludes an entity from maintaining any action in any tribunal in this Commonwealth until a registration has been completed. *Id.* We do not address and therefore offer no opinion on the issues raised by these statutory provisions, as the parties have not raised compliance issues in this appeal.

recognize the import of conducting business under an assumed or fictitious name.

The point is amply demonstrated in the early case of **Ulick v. Vibration Specialty Co.**, 35 A.2d 332 (Pa. 1944). In **Ulick**, the question presented was whether a warrant of attorney to confess judgment contained in a contract signed by the "Federal Home Improvement Co.," a fictitious name for an individual--Edna Ulick--who owned the company, could be exercised by Ulick against the other contracting party. **Id.** at 333. Ulick had registered the trade name of "Federal Home Improvement Co." under the Pennsylvania's Assumed or Fictitious Names Act prior to execution of the contract.[17] **Id.** The Court held that registration being of record was constructive notice of the nature of the person or business that was negotiating or contracting. **Id.** As such, the appellant in **Ulick** could not "plead ignorance of facts of which it was deemed to have had notice," or claim it was "deceived in any manner or that any fraud was perpetrated upon it." **Id.** Ulick was in fact the real contracting party to the contract and the trial court therefore properly refused to strike off the confessed judgment. **Id.** at 334.

---

[17] Fictitious names registered under former provisions of Pennsylvania's fictitious names acts are deemed to be registered under the current act. **See** 54 Pa.C.S.A. § 304.

Here, as in **Ulick**, Appellants executed their contract with Grace under their trade or fictitious name. Grace accepted payment from BCFW for worked performed under the Contract. The record on summary judgment does not support Grace's contention that "Burlington Coat Factory" is a separate entity from Appellants so as to deprive Appellants from pursuing breach of contract claims against Grace under the Contract.

For all of the foregoing reasons, we vacate the order entering summary judgment in favor of Grace and remand this matter to the trial court for further proceedings consistent with this opinion.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/29/2015